[No. C044660. Third Dist. Feb. 15, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
LISA ANN PLATZ, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of parts II, III, and IV.

COUNSEL

Bruce Eric Cohen for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Mathew Chan and Catherine G. Tennant, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**RAYE, J.**—Defendant Lisa Ann Platz will spend the rest of her life in prison for the death of her nine-year-old daughter. She alone is criminally liable, although many others set in motion or contributed to the events that led to her daughter's tragic death. Those participants and their decisions, however, are not before us. We must affirm the jury's verdict convicting Lisa of murder (Pen. Code, § 187, subd. (a))[1] and finding true the special circumstance that the murder occurred during the commission of a kidnapping (§ 190.2, subd. (a)(17)) because her legal challenges are without merit and we cannot say any of the evidentiary or prosecutorial errors resulted in a miscarriage of justice. If there was a miscarriage of justice in this case, it preceded the kidnapping and death of the child and therefore is not one we have the ability to review or to rectify.

## FACTS

After a six-month attempt at sobriety and law-abiding conduct, Jose Aramburo began dating Lisa, whom he found attractive. She became pregnant, and their daughter Rebbeca was born on April 4, 1992. Not long after that, their relationship deteriorated. The police were called on a number of occasions following reports of physical abuse. By then, Jose was about 29 years old and his life had been characterized by "drinking, fighting and general petty criminal behavior." He moved out.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Lisa was Rebbeca's primary caretaker. She asked Jose for financial assistance. He admitted that his financial support consisted of giving her money for diapers from a tip jar when she came into the bar where he worked. Lisa maintained a warm relationship with Jose's parents to establish a bond between Rebbeca and her grandparents. Jose testified he saw Rebbeca daily or weekly.

Karen Buchanan testified otherwise. She owned a café frequented by Jose and Lisa before Jose moved out. Lisa helped Buchanan open a new restaurant. Buchanan testified that she never saw Jose with Rebbeca after she was one or two weeks old. By January or February 1994 Jose had told Lisa he did not want to have anything to do with her. Shortly after that, Lisa moved home to Alaska. Her family lived close by.

By all accounts, Lisa was a devoted and effective parent. Rebbeca thrived. Jose knew they had moved to Alaska and he knew Lisa's parents' telephone number. He never contacted Lisa and Rebbeca. In March 1995 his new girlfriend, Angelina Haggard, gave birth to twin boys who lived only a few minutes. Angelina married Jose five months later.

In 1996 Lisa remarried. Rebbeca referred to Lisa's husband, Robert Platz, as her father. They established a close relationship. Robert attempted to adopt Rebbeca. Jose resisted the adoption and, with his new wife's help, initiated court proceedings to regain visitation and custody of Rebbeca. Lisa was not served with notice of the action for nine months.

In the meantime, Lisa's relationship with Robert ended and she began dating James Csucsai. Together they left Alaska, looking for work and a new life. They traveled for six months, then settled in Ohio, living across the street from James's sister. Lisa was accepted to a business school and, having scored highly on her admissions test, was offered a work study job as well as admission.

Rebbeca continued to flourish. Lisa was loving, attentive, and affectionate. Jane Hildebrand, the senior admissions representative at Ohio Business College and vice-president of the Sheffield City (Ohio) Schools Board of Education, testified that Lisa was a dedicated student, congenial coworker, and an excellent employee. She lavished praise on Lisa's parenting skills, explaining that she set boundaries for Rebbeca, dressed her appropriately, groomed her well, and, unlike most students who brought their children to school, always brought enough for Rebbeca to do and to eat. As a result of Lisa's exemplary parenting, in Hildebrand's view, Rebbeca made excellent eye contact for a seven year old, spoke in long sentences, had a good vocabulary, and was very well behaved. In short, Rebbeca was a joy to have around.

Then, to Lisa's shock and surprise, Jose resurfaced. Although Rebbeca had not seen or heard from her father for five years, in April 1999 Jose served Lisa with a verified petition for determination of custody. The action had been filed in Alaska. In May Lisa appeared in propria persona to obtain an extension of time to file an answer, but then failed to formally respond to the petition.

In July the Alaska court entered a temporary visitation order. On August 4, 1999, a default was entered at Jose's request. Lisa participated in a telephone hearing on September 8. When asked if she would follow a court order to allow visitation, she candidly, but naively, responded: "I would love to say, yes, if I believed that it would not damage her. But I don't know that. I cannot predict the future and I do not know how the child will react." The response may have been understandable. Lisa only knew the Jose who drank, fought, and had been irresponsible, and she had no idea how her seven-year-old daughter would react to the unexpected emergence of a stranger in her life. However, her attitude toward Jose compromised her legal position. She failed to follow the Alaska court's order to integrate Jose, who lived in Washington, into Rebbeca's life in Ohio.

On October 29, 1999, the Alaska Superior Court in Fairbanks awarded custody to Jose. Just before Christmas, Jose, whom Rebbeca had not seen since she was a toddler, and her new stepmother, whom she had never met, flew to Ohio to take her from her mother. Lisa tried to remove Rebbeca from school before their arrival. The school authorities called the police. Lisa and Rebbeca were taken to the police station, where Jose and his wife took custody of Rebbeca.

The Alaska Supreme Court ultimately reversed the custody order, and thereafter a custody investigation was commenced. Rebbeca had lived with the Aramburos for about a year. They had a new baby whom, not surprisingly, Rebbeca adored. She continued to do well in school. Nevertheless, she expressed her desire to live with her mother to every counselor and investigator who interviewed her. Yet she was only allowed to speak to her mother four times a week, and often the Aramburos were not home at the designated times for the calls.

While the appeal was pending, Lisa exercised her rights of visitation. Rebbeca spent the summer of 2000 with her mother. Lisa took her to counseling to help her adjust to the change in custody. This counselor repeated what every other professional reported: the mother and child had a very strong bond and Rebbeca wanted to live with her mother. Lisa returned Rebbeca to Washington at the end of the summer as ordered.

Many witnesses testified to Lisa's bitterness toward Jose for uprooting Rebbeca and insisting on sole custody. Lisa failed to appreciate the ramifications of her resentment. The court investigators saw Lisa's resentment, whether justified or not, as an obstacle to Jose's legal rights as a father, whether deserved or not. Moreover, although the Supreme Court ultimately held that the trial court had improperly awarded Jose custody without consideration of Rebbeca's best interests, by the time those interests were evaluated, the Aramburos were able to present themselves as a stable family, touting Angelina's parents' assistance and their new baby. By contrast, they reported that Lisa moved frequently, and despite the fact Rebbeca had qualified for a program for gifted students, she had also been kept out of school for six months while Lisa and James traveled. No one questioned the effectiveness of Lisa's parenting, and everyone agreed Rebbeca wanted to live with her mother. Nevertheless, because of Lisa's hostility toward Jose, they recommended that he retain custody.

Rebbeca spent her spring break in 2001 with Lisa. They spent time in San Diego with James's sister, Cathy Tarzia. Tarzia testified that Lisa said negative things about Jose and expressed her disbelief that she had been forced to give up custody of her daughter. Lisa again took Rebbeca to the counselor in Ohio, who reported that Rebbeca displayed only positive feelings for her mother and mixed feelings for her father. Lisa failed to return her pursuant to the court order because Rebbeca "begged her" not to. In June 2001 she was arrested for felonious interference with Jose's custody rights.

Life continued to unravel for Lisa and James. James was embroiled in his own custody battles with his ex-wife. James, a veteran, owned at least four guns. With a history of being bipolar and delusional, his family became concerned that he was highly suicidal. In fact, his sister had surreptitiously removed guns from his car and hidden them in her house. Her concern proved prescient. In an angry e-mail James sent to his ex-wife on July 10, 2001, he warned that her desire to see him destroyed would backfire: "[D]on't wish for somethiong [sic] you may not really want to see. . . . [W]hen I go, I'm going out big." It was only Lisa and his kids, according to James at the time, who had kept him from falling "over the edge." On July 17 the Washington family court ordered Lisa to have no further contact with Rebbeca.

On August 13 Lisa and James, both armed, approached Rebbeca and her stepmother as they were getting out of their car at day care. Rebbeca ran to her mother and hugged her after Lisa told her to get into the car. James threatened, "[I]f he comes looking for her, I'll put a bullet through his head." They drove away.

A Federal Bureau of Investigation (FBI) agent in Washington contacted Cathy Tarzia. She expressed her concerns about James's mental health and the likelihood of violence and suicide. According to the agent, Tarzia did not say that Lisa had alluded to killing Rebbeca rather than letting her go back to Jose. The agent's information was that Lisa loved Rebbeca. At trial, Tarzia testified that Lisa had said she would rather see Rebbeca dead than back with Jose.

James's e-mails to his ex-wife on September 20 evidence his further deterioration. He wrote: "Count your days bitch. . . . You and every other mother fucker who made it their goal to make sure I wasn't going to be able to have a life will pay. . . . [Y]ou fuck faces better pray they find me before I get to you. . . . Your [*sic*] a fucking cunt and you and any other fucking related [*sic*] to you will pay." He sent an e-mail to his sister Cathy that same day: "Tell mom, my kids, and everyone else I love them and I'm sorry for all the [*sic*] of this, BUT I'm not ending it and coming home to talk to any asshole lawyers or anything like that. When they do catch up with us there will big [*sic*] a big gun fight and we'll win or we'll die on that spot. There won't be any jail for anyone! Including Rebecca." He also told Cathy in the e-mail, "Lisa and Rebecca have very little to do with why I'm doing what I'm doing, and what I'm going to do."

The South Lake Tahoe Police Department issued an alert to officers that James and Lisa might be at a campground. The officer who found their camp about 1:00 a.m. on September 21 knew nothing about James's mental health. Tarzia had warned authorities that her brother could shoot someone if he felt cornered. Within a half hour, police officers surrounded the tent and shined lights, and the police dog started barking. An officer shouted, "There's no way out. Come on out," and "If you try to flee, the dog will get you." Rebbeca started to cry. James unzipped the tent, yelling "Get the fuck away," and the officer saw Lisa with a "concerned and surprised look on her face" and a "very frightened" Rebbeca in the back corner of the tent.

There is conflicting evidence about what happened in the tent during the next nine hours. Hostage negotiators arrived. At trial, the negotiators, police officers, and emergency medical personnel offered very different accounts of what they saw and heard. The forensic evidence is equally conflicting. But there is no dispute that when a SWAT team stormed the tent, they found the lifeless body of nine-year-old Rebbeca with rigor mortis already established. She was lying under her mother's left side, covered by blankets. Their heads were close, facing each other. Her neck had been slashed with a knife. James was bleeding severely from the neck, and Lisa was bleeding from both wrists. Both Lisa and James were still alive.

The prosecution's central theory at trial was that Lisa slashed her daughter's throat so she would not be returned to Jose. Officer Robert Heindl testified on direct examination that shortly after the confrontation began, Lisa said: " 'We're all prepared to die. We're all going to die in here. It's going to be your fault that we all die.' " But on cross-examination, he revised her statement, claiming that she actually said: " 'You're going to kill us if you don't go away. If you don't leave, we're all going to die.' " Sergeant Terry Daniels, a 20-year veteran and the watch commander on the night of the murder, was standing about 15 feet from the tent and never heard Lisa speak. He attributed the statement "We're all going to die here" to James.

Somewhere between 1:45 and 2:30 a.m., James zipped up the tent and Heindl heard the tent being ripped and cut. He then saw the tent lift off the ground and begin moving toward a white car parked close by. According to Heindl, "all hell broke loose." An officer screamed, " 'Stop. We're going to shoot,' " the police dog was barking, and radios were going off. Another officer disabled the car and, during a search of the vehicle, found two handguns and an assault rifle. Then suddenly, the occupants of the tent became very quiet for about three to five minutes.

Again, the officers differ on what happened next. Heindl testified that Rebbeca screamed, her screams became muffled, and she kicked the wall of the tent on the northwest corner. Officer Alfredo Ramirez testified the scream occurred before the tent was set down while everyone inside was yelling, and that the tent bulged mostly on the east and south sides. Heindl asked, "Why was she screaming?" He testified that Lisa responded the dog was scaring Rebbeca, but that the dog did not bark until after the scream. On cross-examination, he admitted that the dog had barked when the tent started moving and the officers began shouting. The officer in charge of the dog testified the dog had barked a lot from the very beginning of the police action. This same officer also testified that the movement of the tent preceded the scream by an hour or an hour and a half. By Heindl's calculations, the scream occurred by 2:30 a.m., whereas another officer recorded that the scream occurred at 3:56 a.m. An experienced crisis negotiator, who took position behind the white car at 4:54 a.m., was certain he heard Rebbeca whining at least an hour after that time.

An FBI agent who had been trained in hostage negotiations but had never actually negotiated a release tried to lower James's level of "emotionality." James, according to this agent, expressed anger at his ex-wife, Jose, and the Alaska court system. He professed his love for Lisa and Rebbeca and informed the agent, " 'We're trying to decide whether to kill ourselves.' " The police officer who relieved the agent, a woman, was unable to establish any rapport with James. After an hour, the FBI agent resumed negotiations. When

James's voice became faint and they heard gurgling sounds around 10:30 a.m., the SWAT team stormed the tent.

The prosecution introduced evidence that at the time of her arrest, Lisa complained about her wrists but did not ask about Rebbeca. Yet El Dorado County Sheriff's Deputy Daniel Bears testified he heard her say, " 'He cut me. He cut me.' " Craig Pollock, the head of the emergency medical crew, testified that Lisa was disoriented and on a measure of neurological function came within one point of having to go to a trauma facility. In the ambulance, he testified that Lisa was flailing and cried over and over again, " 'He hurt my baby. I want to die.' " She continued flailing and pulled out one of the IV's. A police officer accompanying Lisa in the ambulance testified he did not hear Lisa crying or see her flailing.

By the time she arrived at the hospital, Lisa had lost two liters of blood and required a transfusion. She was in shock. The defense forensic pathologist, Gregory Reiber, concluded that someone else inflicted the injuries Lisa sustained to her left wrist, but the less severe injury to her right wrist was self-inflicted. The cut on the back of her left thumb was consistent with trying to ward off a blow. Reiber testified that a person in shock typically experiences intermittent unconsciousness or low consciousness. The prosecution's pathologist testified that both injuries could have been self-inflicted.

Prosecution witnesses testified to statements the prosecution inferred were incriminatory. At the hospital, Lisa purportedly asked if Jimmy was alive, and when told that he was, she remarked, " 'I guess he made it, too.' " According to an evidence technician, Lisa said she could not open her hand because she cut it. According to a nurse Lisa thanked for being nice to her, Lisa said, " 'I'm the bad guy here.' "

The prosecution attempted to prove that Rebbeca's assailant slashed her throat from behind. Again, the forensic experts presented competing theories based on the presence or absence of blood, residual wounds, and the location of the weapon. One of the prosecution's experts testified that she believed the knife was wielded from behind based on photographs of frontal and rear assaults she found in a textbook. She discounted the fact that Rebbeca's blood was on James's clothes but not her own, because her wounds would not have bled very much. A criminalist from the Department of Justice did not find any of Rebbeca's blood on any of Lisa's clothing.

Two other pathologists disagreed with the prosecution's expert, and a senior criminalist testified that cuts like those to Rebbeca's neck result in a significant loss of blood. Dr. Reiber testified that the only scenario that accounted for all of the child's injuries involved the assailant's holding her

jaw and kneeling on her chest as the assailant slashed. The pathologist who initially testified for the prosecution, in surrebuttal for the defense, stated the prosecutor had mischaracterized his testimony when examining its other pathologist. He further testified he did not believe the evidence supported the rear-assault theory but, to the contrary, a frontal attack was much more likely to produce the irregular wounds found on Rebbeca.

Before hanging himself in his cell on April 5, 2002, James made a variety of incriminating statements. On November 22 he wrote, "They say that no one who stands poised at the doorway to eternity steps through it with a lie on his lips. They say that deathbed confessions are always to be believed. And this letter is mine. [¶] . . . [T]he only image I have of it all was of a pair of hands, a knife and an innocent child laying [*sic*] lifeless beneath me. My next image was of you laying [*sic*] next to her, you were soaked in blood, your wrist was cut, my neck was bleeding. You looked very frightened. I think you were frightened of me. . . ."

A few days later, prison personnel moved a man into James's cell who bore some resemblance to Jose Aramburo. A deputy testified that James got very agitated and said: " 'He looks just like the man who was responsible for me being here. I can't stay in there with that Mexican. I killed a little person because of a man who looks just like him. You need to move one of us or we will not last 24 hours.' "

James's sister painted a portrait of a weak, sick man trying to avoid conflict and attempting to keep the peace. She insisted that defendant had a much stronger personality than her brother, who, in the opinion she offered at trial, was not capable of taking another person's life. She claimed that during a visit to the jail Lisa remarked, " 'Now Jose's going to get her body.' " Several law enforcement officers testified that Lisa had not made the statements the sister claimed at trial.

## DISCUSSION

### I. CHILD'S CONSENT TO KIDNAPPING

A. *Trial Context*

Defendant begins with the proposition that the prosecutor's primary theory was felony murder. Not so, from our reading of the record. The District Attorney of El Dorado County attempted to convince the jury that Lisa personally used a knife to slaughter her daughter. (§ 12022, subd. (b)(1).) He failed. But the thrust of the prosecution and thus, by necessity, the focus of the defense was whether Lisa or James personally slashed Rebbeca's throat with a knife.

Defendant's arguments on appeal must be put in the context of the manner in which this case was actually tried, just as we have attempted to recount the facts surrounding the kidnapping in the broader context in which the taking of the child occurred. As heart rending as it is that an erroneous child custody ruling in Alaska set in motion a mother's unraveling, at trial she faced the insurmountable obstacle of overcoming the felony-murder rule. But in the years leading up to the trial, the focus was not on felony murder, but first on whether she would face the death penalty and then on whether she could convince a jury that she did not personally kill her own daughter. Thus, while felony murder was certainly the most obvious theory upon which to convict Lisa, it was not, as her lawyer suggests on appeal, the primary theory urged by the prosecution.

Defendant complains that the court's interpretation of California's kidnapping statute, when coupled with the felony-murder rule and the alleged special circumstance, left the impression the jury had nothing to decide. We agree. While the prosecution's theory that Lisa killed her daughter was riddled with holes and inconsistencies, the defense had little, if any, ammunition to fight the much less emphasized theory of felony murder. Indeed, the district attorney emphasized the breadth and scope of the felony-murder rule by pointing out to the jury that once Lisa kidnapped her daughter in Washington, she would be liable for the child's death even if "Rebbeca had been bitten by a rabid squirrel and died of rabies."

Lisa mounted an impressive defense to the prosecution's primary theory at trial but was left with very little to resist a felony-murder conviction predicated on her participation in the kidnapping. It is true, as she argues here, that her lawyer requested an instruction that if the jurors found Rebbeca had consented to the taking, they could find Lisa had not used the requisite force to sustain a kidnapping charge. Moreover, she insists that consent was the very essence of her defense and thus, when denied her request for a consent instruction, the court deprived her of her constitutional right to present her defense and committed a host of other unconstitutional transgressions. In actuality, the thrust of her defense at trial was that James was the perpetrator, a fact that, even if true, did not exonerate her from accomplice liability or felony murder. Nevertheless, her only defense to felony murder was consent and thus, on appeal, the issue has enormous implications. We must carefully deconstruct her legal challenge to the kidnapping conviction.

B. *Plain Meaning of Section 207, Subdivision (d)*

Lisa was charged with kidnapping under section 207, subdivision (d), which provides: "Every person who, being out of this state, abducts or takes by force or fraud any person contrary to the law of the place where that act is

committed, and brings, sends, or conveys that person within the limits of this state, and is afterwards found within the limits thereof, is guilty of kidnapping." The trial court interpreted this section to mean that the phrase "abducts or takes by force or fraud any person contrary to the law of the place where that act is committed" means that Washington law defining the requisite force applies. The court rejected the defense instruction on consent because under Washington law a child under the age of 16 cannot consent or acquiesce to a taking.

Lisa asserts that under California law the jury could have found she did not forcibly take Rebbeca since the child ran to her and did not appear to be frightened. In Lisa's view, the force was directed toward Angelina, not Rebbeca. The Attorney General contends that a nine-year-old child cannot consent to a kidnapping under the egregious circumstances present here. According to the Attorney General, Lisa loses under either Washington or California law. On the facts before us, we must agree.

■ We certainly must give Lisa the benefit of every reasonable doubt as to the meaning of the language used in a penal statute. (*People v. Fenton* (1993) 20 Cal.App.4th 965, 968 [25 Cal.Rptr.2d 52].) If a penal statute is ambiguous, we apply the rule of lenity favoring a construction that avoids particularly harsh consequences for the defendant. (*People v. Hernandez* (2003) 30 Cal.4th 835, 869–870 [134 Cal.Rptr.2d 602, 69 P.3d 446].) But due process does not compel us to violate the plain meaning of the words of the statute. " 'If the language contains no ambiguity, we presume the Legislature meant what it said, and the plain meaning of the statute governs.' [Citation.]" (*People v. Smith* (2004) 32 Cal.4th 792, 797 [11 Cal.Rptr.3d 290, 86 P.3d 348].)

Lisa insists the plain meaning of the statute is that the taking has to be "contrary to the law of the place" where it occurs, but the determination as to whether the taking was "by force" is determined under California law, not the law of the state where the taking occurred. Thus, Lisa parses the words of the statute in a strained attempt to rescue her so-called California consent defense, unavailable under the law of Washington. Lisa concedes on appeal, as she did at trial, that the taking violated the law of Washington, but she maintains it was not "by force" as that term is applied in California.[2] Try as we might to apply all the rules of interpretation in Lisa's favor, we cannot accept her distorted interpretation of the plain meaning of the statute.

■ The challenged language reads: "Every person who, being out of this state, abducts or takes by force or fraud any person contrary to the law of the

---

[2] The concession is appropriate. (See *State v. Billups* (1991) 62 Wn.App. 122, 127 [813 P.2d 149, 152].)

place where that act is committed . . . ." (§ 207, subd. (d).) The act described in the last phrase refers to the forceful or fraudulent abduction or taking defined by the law of the place where the act is committed. We can discern no ambiguity in this straightforward requirement. The act is either lawful or unlawful according to the definition of the crime in the state where the act occurs. It may be, as Lisa suggests, that the Legislature intended to shield mobile defendants from prosecution for a kidnapping as defined under California law when the taking itself was lawful in another state. But that does not mean the reverse is true. That is, the language of the statute does not support the argument that the Legislature intended a defendant whose forceful abduction or taking constitutes kidnapping under the law of the place where the act was committed to get a free pass once the kidnapper crosses the border into California.[3]

Lisa insists that the trial court's interpretation of the statute is at odds with the statutory context, legislative history, common sense, and her constitutional rights. In essence, she claims that the Legislature could not have abdicated its responsibility to define a crime to the legislatures of states and nations across the globe. She finds such "locus shifting" untenable because, under this interpretation of the statute, California would be forced to apply foreign law in criminal prosecutions.

We need not address either of these arguments for two reasons. First, the statute is plain on its face, and in the absence of an ambiguity, we need not explore beyond the plain meaning of the language adopted by the Legislature. Second, and more fundamentally, Lisa would not have had a consent defense under the law of California and the facts before us.

## C. *Child's Consent in California Kidnapping*

Lisa would have us conclude that a jury should have had the opportunity to find she did not forcibly take Rebbeca despite the fact that in violation of a Washington court order prohibiting her from having any contact with her daughter, she and James jumped out of their car holding guns and instructed Rebbeca to get into the vehicle. In Lisa's view, her nine-year-old daughter's preference to live with her translated into an implied consent to live on the run, chased by the FBI and moving from campground to campground across

---

[3] Lisa argues that extradition solves the "free pass" problem. While extradition may be a viable alternative remedy, the availability of a viable alternative remedy does not mean the statute does not provide California the option to prosecute a kidnapping that began out of state (under the laws of the foreign jurisdiction) and ended within California's borders.

the country. Following this logic, the child's love of her mother transcended any fear or force involved in the initial taking and, at a minimum, had dissipated by the time they crossed into California and settled into the campground by Lake Tahoe.

■ While we agree with Lisa that California case law is not as straightforward as the Attorney General suggests, we do not agree that under the facts presented here she was entitled to an instruction suggesting that Rebbeca's consent vitiated the requisite force to sustain a kidnapping. The Supreme Court in *In re Michele D.* (2002) 29 Cal.4th 600 [128 Cal.Rptr.2d 92, 59 P.3d 164] (*Michele D.*) held that "the amount of force required to kidnap an unresisting infant or child is simply the amount of physical force required to take and carry the child away a substantial distance for an illegal purpose or with an illegal intent." (*Id.* at p. 610.) Relying on *Michele D.*, the Attorney General contends that because Lisa took Rebbeca in violation of the Washington restraining order and for the unlawful purpose of depriving Jose of custody, the defense of consent was not available to her.

Lisa would have us allow the jury to assess Rebbeca's maturity and competence to consent, analogizing kidnapping to a hearing in a custody dispute wherein children's wishes are considered by the judge. (*In re Marriage of Rosson* (1986) 178 Cal.App.3d 1094, 1101 [224 Cal.Rptr. 250], disapproved on other grounds in *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 38–39, fn. 10 [51 Cal.Rptr.2d 444, 913 P.2d 473].) Moreover, she points out that the district attorney apparently believes in the maturity of the eight- and nine-year-old defendants he has prosecuted for the commission of various felonies in El Dorado County. We need not weigh in on the maturation of children under 10 years old. Our sole task is to apply the applicable precedent to the facts before us.

Faced with an analytical stumbling block in cases involving the asportation of infant and young children without apparent force, the Supreme Court devised the special rule cited above, wherein the force element of kidnapping is satisfied when a child cannot consent so long as the perpetrator takes the child for an illegal purpose or with an illegal intent. (*People v. Oliver* (1961) 55 Cal.2d 761, 768 [12 Cal.Rptr. 865, 361 P.2d 593].) It is true, as Lisa maintains, that *Michele D.* involved the taking of a 12-month-old baby and its predecessors, *People v. Oliver* and *People v. Hill* (2000) 23 Cal.4th 853 [98 Cal.Rptr.2d 254, 3 P.3d 898], involved the taking of a two year old and a seven

month old, respectively. *Parnell v. Superior Court* (1981) 119 Cal.App.3d 392 [173 Cal.Rptr. 906] *(Parnell)* involved a seven-year-old boy, but in that case, two strangers tricked the child into getting into their car and twice countermanded his request to contact his parents. As a consequence, the court found ample force to satisfy the "forcible taking" element of section 207. In dicta, however, the court admonished: "Steven's near passive conduct should not be construed as consent; rather, it more logically evidences the inability of a minor to give a knowing consent." *(Parnell,* at pp. 402–403, fn. 3.)

█ Such passive conduct is precisely what Lisa construes as her nine-year-old daughter's knowing consent. Or at least she believes the jury could, and should, have been allowed to construe her conduct as a knowing consent. While, unlike Washington, California has not set a precise chronological cutoff for the age at which a child can consent to what otherwise would constitute a forcible taking, we have no doubt that nine-year-old Rebbeca, instructed by her mother and her mother's boyfriend at gunpoint to get into the car, was not capable of knowingly consenting to the taking. We express no opinion as to whether children of her age in other circumstances might be capable of consenting or at what age older children might be able to exercise sufficient independent judgment to consent to a taking that might appear dangerous or precarious. Cases involving children in custody disputes or the prosecution of young children provide no guidance for the specific issue before us. Accepting the Supreme Court's formulation of the standard for proving force involving children, we hold that Lisa could not avoid a kidnapping conviction even if Rebbeca acquiesced in the taking because Lisa's unlawful intent sufficed as a matter of law. Thus, Lisa had no consent defense under either Washington or California law.[4]

*Entry Into California*

Assuming, as we do, that she could not avail herself of a consent defense under Washington or California law at the time she took Rebbeca, Lisa urges us to find that the defense became viable by the time she brought the child into California and, specifically, by the time the child was murdered. She acknowledges there are no cases directly on point. While we might imagine facts such as those described in *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1299 [280 Cal.Rptr. 584], in which a forcible taking ends and the victim later voluntarily and willingly consents to accompany the initial abductors, we

---

[4] Since we have concluded Lisa did not have a defense of consent under California law, we need not address her arguments that she was denied due process and equal protection by arbitrarily denying her a defense available to California defendants. Moreover, courts routinely apply the laws of their sister states. There is no merit to her claim that she has been denied a right to appeal a construction given Washington law. Her claims fall under well-established principles of California law.

cannot say that any facts presented here would give rise to the type of knowing consent unavailable at the time of the taking. After all, Lisa and James transported a nine-year-old child across state lines armed with an arsenal of knives and guns. They were on the run, attempting to evade capture for over five weeks. A young child in these circumstances has no capacity to consent to a kidnapping, no matter how much she loves her mother or how little she fears being shot, stabbed, or slashed. There are simply no facts to suggest a material change in circumstances from the time of her forcible taking that would give rise to a consent defense up until the moment the child was killed in the tent.

*Felony Murder and the Felony-murder Special Circumstance*

**1. Voter Intent.** Turning from divining legislative intent to divining voter intent, Lisa contends the voters did not intend that kidnapping would be defined by the law of other jurisdictions when they voted to make kidnapping a basis for a first degree felony-murder conviction and made kidnap felony murder a basis for imposing the death penalty. She emphasizes that at the time the initiatives were passed including kidnapping as a predicate crime under sections 189 and 190.2, subdivision (a)(17)(B), the kidnapping statute included all its variants in one section. In other words, the kidnapping statute was not broken into subordinate sections. She argues it is unreasonable to think the voters believed that in the circumstances eventually described in section 207, subdivisions (a), (b), and (c), California lawmakers would define the elements of kidnapping, but in circumstances in which the victim was taken out of state and transported into California, foreign lawmakers would define the crime. She expresses disbelief the voters would approve such a "chameleon-like" crime of kidnapping.

While the organization of section 207 may have changed, the substance of the kidnapping statute as it relates to out-of-state kidnapping has not. At the time the voters added kidnapping as a basis for felony murder and a special circumstance, California kidnapping law included the clause that an out-of-state taking becomes a California kidnapping if the perpetrator "abducts or takes by force or fraud any person contrary to the law of the place where that act is committed" and later enters California. (§ 207, subd. (d).) The language would have been as plain to the voters as it was to the legislators. We find nothing repugnant about the notion that California has incorporated the law of the jurisdiction in which a person is taken or abducted into California's definition of kidnapping. We are not at liberty to alter the plain meaning of the

language of a statute adopted by voters any more than we can ignore or override the plain meaning of a statute enacted by the Legislature. (*People v. Canty* (2004) 32 Cal.4th 1266, 1276 [14 Cal.Rptr.3d 1, 90 P.3d 1168].)

**2. Instructional Error.** Lisa complains that the trial court erroneously "elongated" the crime of kidnapping, thereby virtually assuring her conviction of felony murder and the kidnapping special circumstance. She maintains there was no kidnapping in progress at the moment Rebbeca died. The court instructed the jury:

"For the purposes of determining whether an unlawful killing has occurred during the commission of a kidnapping, the commission of the crime of kidnapping is not confined to a fixed place or for a limited period of time.

"A kidnapping is in progress after the original abduction while the perpetrator is fleeing in an attempt to escape. Likewise, it is still in progress so long as pursuers are attempting to capture the perpetrator and/or obtain the release of the person abducted.

"A kidnapping has ended when the person who was abducted has been freed from confinement and/or restraint and has reached a place of safety."

Lisa argues that a kidnapping ends when the forcible aspect of the detention ends and the victim is no longer being transported against her will. The instruction given by the trial court, according to Lisa, invented a new crime by allowing the jury to find that the killing occurred during the commission of the kidnapping even if it took place weeks later, in a far distant location, and long after the cessation of force. In short, she maintains that the kidnapping ended once Rebbeca consented to the journey.

The argument is nothing more than an elongation of her earlier claims. And it fails because it is based on the erroneous premise that Rebbeca had the legal capacity to consent to the Washington kidnapping at some point before or after crossing into California but before she was murdered. The instruction properly informed the jury that kidnapping continues until the victim is freed and has reached a place of safety. Rebbeca, quite obviously, never reached such a refuge.

Nor are we troubled by the court's slight modification of the instructions to fit the facts of the case. Lisa objects to the court's improvised version of CALJIC No. 8.80.1 because it dropped the word "immediate" and told the

jurors they could find the special circumstance true if Lisa was "engaged in flight after having committed the crime of kidnapping." Similarly, Special Instruction No. 6, adapted from CALJIC No. 8.21.1, dropped the modifier "temporary" and allowed the jury to find the kidnapping continued no matter how many temporary places of safety the trio reached. Lisa contends that the modification of the instructions enlarged the predicate offense of kidnapping "in ways that have no precedent in California jurisprudence."

We disagree. The court properly instructed the jury on the crime of kidnapping, explaining that the crime continues while the perpetrator is fleeing in an attempt to escape. Since the trio had evaded capture for a prolonged period of time, it was reasonable for the court to tailor the instructions to fit the facts of the case. (*People v. Cole* (1988) 202 Cal.App.3d 1439, 1446 [249 Cal.Rptr. 601], disapproved on other grounds in *People v. Martin* (2001) 25 Cal.4th 1180, 1191–1192 [108 Cal.Rptr.2d 599, 25 P.3d 1081].) Lisa seems to suggest that a kidnapping may end by the mere passage of time and space. Not so. The court simply informed the jurors that the kidnapping could continue as long as Lisa pursued an escape and failed to release her daughter to a place of safety.

We must agree with the Attorney General that the facts of this case are precisely the kind of tragic outcome the felony-murder rule is designed to prevent. Moreover, the voters have determined that kidnapping is fraught with such risk of harm to the victim that a jury can make a special finding with additional punitive consequences if a killing occurs during the commission of the kidnapping. Irrespective of Lisa's intentions, and despite the love she had for her daughter, the fact remains that she, together with James, took Rebbeca from her stepmother at gunpoint, transported her across state lines, and ultimately failed to release her during the harrowing confrontation at the campground. As a result, she died a violent and gruesome death. The jury was thus able to hold her mother responsible for the death, even if that death was unintended.

II–IV[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante*, page 1091.

## DISPOSITION

The judgment is affirmed.

Sims, Acting P. J., and Butz, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 14, 2006, S142120.