Filed 10/24/14  P. v. Sagapolu CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>CECIL KUUIPO SAGAPOLU,<br><br>     Defendant and Appellant. | A135464<br><br>(Alameda County<br>Super. Ct. No. C167678B) |

A jury found Cecil Sagapolu guilty of the second degree murder of Giselle Ortiz and of being a felon in possession of a firearm.  Ortiz had been shot, but there were no witnesses.  Immediately after the shooting, Sagapolu maintained that Ortiz had attempted suicide.

On appeal Sagapolu maintains that he was deprived of effective assistance of counsel because defense counsel (1) failed to raise an objection to a question of an expert witness; (2) failed to counter the prosecutor's argument that it would have been difficult for Ortiz to shoot herself; and (3) failed to mention "reasonable doubt" during closing argument.

We find no merit in Sagapolu's arguments and affirm.

Sagapolu has also filed a separate petition for writ of habeas corpus, raising the same issues as on appeal, but seeking an evidentiary hearing concerning defense counsel's omissions.  Because Sagapolu has failed to establish a prima facie case of ineffective assistance, we deny his petition for writ of habeas corpus in a separate order.

1

In addition to Sagapolu's issues, the People assert that the trial court erred in staying the sentence on one of the counts against Sagapolu. Because the People did not raise this issue on their own appeal, but only in reply to Sagapolu's appeal, we do not address the issue.

## BACKGROUND

### I. *Procedural Background*

On November 23, 2011, the People filed an information charging Sagapolu with murder (Pen. Code,[1] § 187, subd. (a)) (count 1) and being a felon in possession of a firearm (§ 12021, subd. (a)(1)) (count 2).[2] The information also alleged enhancements for personal firearm use, intentional firearm discharge causing death, and three prior prison terms. (§§ 667.5, 12022.53, subd. (b).)

On January 20, 2012, Sagapolu stipulated that he had been convicted of a felony for purposes of count 2. Taking of evidence commenced on February 1, 2012.

The jury began to deliberate at the end of the day on February 22, 2012. Deliberation continued over five more days, the jury reaching a verdict late in the afternoon of March 1, 2012. On count 1, the jury found Sagapolu guilty of second degree murder and found true the enhancement for personal use of a firearm. The jury found not true the enhancement alleging intentional discharge of a firearm causing death. The jury also found Sagapolu guilty on count 2.

The People elected not to proceed on the allegation of three prior prison terms, which had been bifurcated. On April 16, 2012, the court sentenced Sagapolu to 15 years to life in prison on count one, with a consecutive 10-year term for the section 12022.53,

---

[1] Unless otherwise indicated, all statutory citations are to the Penal Code.

[2] The information also alleged offenses committed by a co-defendant, John Guerrero. The copy of the information in the record before us is missing pages two through four, including the allegations of enhancements to the murder charge against Sagapolu and the second count alleged against Sagapolu. We state the allegations as contained in the People's brief. Sagapolu does not dispute the People's rendition of the allegations, which is in agreement with the instructions given by the court and the verdict rendered by the jury.

2

subdivision (b), enhancement.  The court sentenced Sagapolu to three years in prison on count 2, but stayed the sentence, pursuant to section 654.

Sagapolu timely filed a notice of appeal on May 14, 2012.

## II. *Factual Background*

In the early morning hours of July 31, 2011, Ortiz, who was in a romantic relationship with Sagapulo, was shot and killed.  Dr. Thomas Beaver, who performed the autopsy, is the chief forensic pathologist for the Alameda County Coroner's Bureau.  He testified that the bullet entered Ortiz's face near the left jaw and exited behind her right ear.[3]  The bullet traveled from front to back, slightly left to right and slightly upwards.  Beaver concluded that the muzzle of the gun was in contact with Ortiz's skin and the wound would have caused death within a few minutes.  He found no defensive wounds and there was no evidence of a struggle.  Ortiz used methamphetamine frequently and had a potentially toxic level of the drug in her body when she died.

The shooting occurred after Sagapolu and Ortiz had driven to the residence of Anthony Ross, an apartment at 885 31st Street in Oakland, California.  Ross saw Sagapolu drive up and assumed that Ortiz was in the car as well, because he had been told that both were coming.  Ross testified that he did not actually see Ortiz in the car, but Lela Vaeao testified that Ross had told of greeting Sagapolu and Ortiz when they arrived and that they then started arguing.  Ross took a shower, which was interrupted when his roommate, John Guerrero, "bang[ed]" on the bathroom door and told him, "Your cousin.  Come out here.  Your cousin."  Ross went outside and found Ortiz bloody, lying on her back on the concrete.  Sagapolu was next to her, also bloody and holding her.  Sagapolu told Ross that Ortiz had tried to kill herself.  The vehicle in which Sagapolu had arrived was still in the driveway.  Ross went inside and told Annette Ruiz, who was at his apartment, that Ortiz had been shot and they needed to take her to the hospital.

Ruiz described Sagapolu as "very upset."  He was crying and saying, "Baby, hold on."  Sagapolu told her that Ortiz had attempted suicide.  Ross, Guerrero and Sagapolu

---

[3]  Ortiz was right-handed.

3

carried Ortiz to Ruiz's van. Ross described Sagapolu as "kind of in shock and crying." Ruiz drove Ortiz, Ross, Guerrero and Sagapolu to the hospital. On the way to the hospital, Sagapolu said, more than once, "Don't die on me." After they arrived at the hospital, Sagapolu told Ross that "he fucked up."

Ross was Ortiz's cousin, but he had known Ortiz for only about 10 years. He had never seen her with a gun. He knew that during the last month of Ortiz's life, Sagapolu was involved with other women, but he didn't know if Ortiz knew. Ruiz had known Ortiz from Ortiz's birth and had also never seen her with a gun.

When the police interviewed Sagapolu, he wept intermittently and appeared to be distraught. Sagapolu said that both he and Ortiz were drunk and that he did not want to provide the details of what happened.

On August 1, 2011, the police served a search warrant at the residence of Johnny Smothers, at 883 31st Street in Oakland, and recovered a Smith and Wesson firearm. Guerrero was inside Smothers's apartment when police arrived. The firearm was a 9 millimeter semiautomatic pistol, model M&P 9. The magazine held 17 cartridges, but only 16 cartridges were present.

Shannon Cavness, an expert in DNA analysis, testified that blood samples from the muzzle end of the firearm provided "an exact match" with Ortiz's DNA allele's at each location examined. It was her opinion that no one else shared Ortiz's DNA profile. Samples from the grip area of the gun were a mixture of female and male DNA and not all alleles were detected. The quality of the evidence sample was so poor that she could neither include nor eliminate Sagapolu as a handler of the gun. No fingerprint evidence was obtained from the gun. Another expert in DNA analysis testified for the defense that in his opinion Sagapolu was not a contributor to DNA samples taken from the gun.

Gunshot residue particles were detected on both of Ortiz's hands. This indicated that Ortiz had recently fired a firearm, was near someone who had recently fired a firearm, or had come into contact with a fired firearm or otherwise had a transfer of particles to her hands. No gunshot residue was found on Sagapolu's hands.

Two dark colored gloves had been recovered from the back seat floorboard of Ruiz's van. Each of the gloves contained a particle that was consistent with gunshot residue, but single particles generally have no significance. The gunshot residue expert did not believe that the gloves had been worn by someone who had recently fired a gun. DNA samples from the gloves were consistent with a mixture of DNA from both Ortiz and Sagapolu. The "deduced" male portion of the DNA sample[4] would occur in only 1 in 260 quadrillion members of the population. Ruiz testified that the gloves looked like ones she kept in her van.

Vaeao, Ortiz's friend and roommate, testified that in July 2011 she saw Sagapolu standing behind Ortiz and holstering a gun. Ortiz, who seemed nervous and shocked, told her shortly afterward that Sagapolu had the gun pointed at her head. On another occasion, Sagapolu told Vaeao that he carried a pistol on his person.

Vanessa Burgos testified that at a party she had observed Sagapolu with a gun in his waistband. Later, when Sagapolu and Ortiz were in Ortiz's room, she saw the gun on Ortiz's lap. Burgos had never heard Ortiz talk about killing herself and had never seen Ortiz with a gun. Burgos was aware that Sagapolu "messed with plenty of other girls." Ortiz was aware of this because "[s]he kind of caught him one time, just, like, having something in his bag." Despite her knowledge, Ortiz continued to date Sagapolu. Ortiz and Sagapolu had frequent arguments and Ortiz "always thought [Sagapolu] was messing around."

In addition to testifying about the Ortiz's autopsy, Beaver stated that he had performed hundreds of autopsies involving self-inflicted gunshot wounds. He stated that

---

[4] Cavness testified: "I was able to deduce the profile of the male donor by looking at alleles that were foreign to the female donor because I know what her profile is. And by looking at the peak heights and determining potentially which peaks could be shared by both donors, I was able to determine most of the locations without any ambiguity." Cavness did not testify about other deduced male profiles that might be possible, given the locations that *were* ambiguous, or provide a calculation on the frequency of the combined possible deduced male profiles in the population. Cavness only said that she could not eliminate Sagapolu as a donor of DNA to the glove and did not express an opinion as to whether he was the male donor of the DNA.

Ortiz's wound was in an unusual location for a self-inflicted contact wound. The most common location for a self-inflicted gunshot wound is the area above the right ear. The next most common location is in the mouth. Following that in frequency would be under the chin and the central part of the chest. What remains "are just sporadic rare cases." It had been years since he had seen a self-inflicted gunshot wound to the left side of the head. During redirect examination, he testified that the only self-inflicted gunshot wound to the face that he had seen was to the center of the forehead.

Mark Bennett testified as an expert in the field of firearms and firearms identification. He examined a photograph of Sagapolu and compared the visible portion of a firearm in the pocket area to the Smith and Wesson pistol recovered by the police. The gun in the photograph had all the features of a Smith and Wesson M&P pistol and he could find no other pistol in the reference collection that had those features. He concluded that the gun in the photograph was a Smith and Wesson M&P pistol, but there was not enough detail to determine if it was the same gun that had been entered into evidence.

## DISCUSSION

Sagapolu contends that he was deprived of effective assistance of counsel because defense counsel failed to raise an objection to Beaver's testimony, failed to counter a prosecution argument in his own closing argument, and failed to refer to "reasonable doubt" in his closing argument. We conclude that defense counsel did not perform deficiently and that, in any case, Sagapolu has failed to show that he was prejudiced by the allegedly deficient performance.

### I. *Legal Standard*

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction . . . has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so

6

serious as to deprive the defendant of a fair trial, a trial whose result is reliable." (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (*Strickland*, *supra*, 466 U.S. at p. 689.)

"When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.] Even where deficient performance appears, the conviction must be upheld unless the defendant demonstrates prejudice, i.e., that ' " 'but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citations.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569.) "If 'counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' " (*People v. Diaz* (1992) 3 Cal.4th 495, 557.)

## II. *Beaver's Testimony*

Beaver's testimony was damaging to Sagapolu because he stated that in his experience, the location of Ortiz's wound was unusual for a self-inflicted gunshot wound. Sagapolu maintains that defense counsel could have prevented Beaver's testimony about self-inflicted wounds by objecting to the first question about such wounds.

7

During voir dire, Beaver testified to extensive qualifications and experience as a forensic pathologist. He had been a forensic pathologist for Alameda County since July 2011. Prior to his current position, he had been a forensic pathologist for Kern County from 2009. From 2006 he was the director of the division of forensic pathology and a faculty member at Texas Tech University. He had been the chief medical examiner in Volusia County, Florida for six years, after he had been an associate medical examiner in Panama City, Florida for two years. Prior to that, for five years, he had been a forensic pathologist in Stanislaus County, covering Tuolumne, Amador, Calaveras, and Merced Counties. He had graduated from medical school in 1986 and then completed a five-year residency training program in anatomic and clinical pathology at the University of Colorado. Beaver also completed a fellowship in forensic pathology at the Denver County Coroner's Office, which included specific training concerning gunshot wounds. He was certified by the American Board of Pathology in anatomic pathology, clinical pathology, and forensic pathology. He had performed in excess of 5,000 autopsies. Following voir dire, the court accepted Beaver as an expert witness in the field of forensic pathology.

Following voir dire, the prosecutor's first question to Beaver was: "Have you ever performed an autopsy on an individual with a self-inflicted gunshot wound?" Beaver answered, "Yes, many times." Defense counsel did not object to the question.

Sagapolu asserts that "the question assumed a fact on which no evidence had been presented, that . . . Beaver knew which gunshot wounds in past autopsies had been 'self inflicted.' " He also argues that the question "would have exceeded the scope of the expertise on which the court had qualified him."

Sagapolu suggests that Beaver may have based his determination of whether past cases involved self-inflicted gunshot wounds "on what he had been told by the police" and that he "had no independent forensic way" to determine if a gunshot wound was self-inflicted. Sagapolu's only basis for such speculation lies within the following excerpt from Beaver's testimony: "Q: Do you have an opinion about the percentage of self-inflicted gunshot wounds that are in the right parietal area? [¶] A. I don't keep a count,

8

but I would estimate it at about 70 percent, maybe 75. [¶] Q. Is this based on your personal experiences or also your training and experience and review of the literature? [¶] A. That's my cases. Cases that I've done." Sagapolu argues that Beaver's "response suggests that recognizing whether a gunshot wound is 'self-inflicted' or not was not a part of . . . Beaver's 'training' as a forensic pathologist." This amounts to frivolous argument. It was clearly the percentage that Beaver attributed to his experience and no conclusion can be drawn from his answer as to whether he had training to recognize self-inflicted gunshot wounds.

Sagapolu provides no reason for believing that forming a conclusion as to whether a gunshot wound is self-inflicted is beyond the normal scope of a forensic pathologist's expertise and we reject his argument that defense counsel should have objected on that basis. Forensic pathologists "commonly" offer opinions "regarding whether the nature of particular wounds indicates that the victim attempted to defend himself or herself, or that the wounds were self-inflicted." (*People v. Steele* (2002) 27 Cal.4th 1230, 1276.) Indeed, Sagapolu undermines his own argument by citing four cases in which forensic pathologists were permitted to give opinions on whether particular wounds were likely to have been self-inflicted.[5] Sagapolu states that the cases he cites "have nothing to do with the present case. Pathologists in these cases were permitted to testify that gunshot wounds were probably not self-inflicted where self-infliction of the wounds would have been extremely difficult or impossible." However, Beaver offered no opinion as to whether the gunshot wound to Ortiz was self-inflicted. Sagapolu forgets that his challenge is to whether, in past autopsies, it was within Beaver's expertise to form an opinion as to whether wounds may have been self-inflicted, and then to make generalizations from those cases. The very cases that Sagapolu cites show that forensic pathologists can, at least under some circumstances, come to a conclusion that a gunshot wound is self-inflicted.

---

[5] *People v. Cole* (1956) 47 Cal.2d 99, 103; *People v. Mayfield* (1977) 14 Cal.4th 668, 765-766; *People v. Palmer* (1978) 80 Cal.App.3d 239, 247; and *People v. Platz* (2006) 136 Cal.App.4th 1091, 1099.

Defense counsel could have legitimately objected to the prosecutor's initial question concerning self-inflicted gunshot wounds because no foundation had been laid concerning how Beaver determined whether gunshot wounds were self-inflicted. The trial judge may well have sustained such an objection, believing that a proper foundation would be helpful to the jury.[6] But this does not mean that defense counsel had a duty to object or provided ineffective representation by failing to object. "Because the decision whether to object is inherently tactical, the failure to object to evidence will seldom establish incompetence." (*People v. Freeman* (1994) 8 Cal.4th 450, 490-491.)

Because defense counsel had no reason (just as we have no reason) to believe that a proper foundation could not have been laid following a sustained objection, a failure to object does not demonstrate deficient performance. And without reason to believe that a proper foundation would not be forthcoming, Sagapolu was not prejudiced by the failure to object.

### III. *Prosecution Argument that Self-Infliction Would Have Been Difficult*

As part of his closing argument, the prosecutor stated: "In order for Giselle Ortiz to self-inflict a gunshot wound like this, now remember, several people testified that she's right-handed. No one testified that she wasn't right-handed. She would have had to turn the gun in such a way that she could put her finger on the trigger. Common sense and logic tells us that an individual is going to use their dominant strong hand to fire a gun. It's perhaps possible to do it differently, but we know that Ms. Ortiz had never been seen by anybody with a gun. Appears to have absolutely no experience with a gun. And

---

[6] Sagapolu asserts that "[t]he trial court would probably have sustained such an objection, because in response to defense counsel's objection that it was 'speculative' for the prosecution to ask . . . Beaver about his past experience with 'right handed' self-inflicted gunshot wounds, the trial court ruled that such questioning, however worded, 'assumes he knows whether the person on whom he's performing the autopsy was right-handed or left-handed' and was therefore impermissible." This assertion assumes that determining whether a wound is self-inflicted and determining a person's dominant hand are equally inside or outside the scope of a forensic pathologist's expertise—an assumption for which Sagapolu provides no basis. However, we agree that the trial court might well have sustained an objection.

this is how you would have to—approximately how you would have to self-inflict a gunshot wound for Ms. Ortiz to have done this to herself. I mean, I'm not—you would have to almost be Gumby to be able to reach around and do that. It's just not a practical way to even inflict a gunshot wound on anyone much less yourself." The prosecutor then went on to argue that for the right-handed Sagapolu to inflict a wound to the left side of Ortiz's face would require no awkward movement.

Sagapolu argues that "the wound could easily be explained by Ortiz turning her head to the right as she pressed the gun against the left side of her jaw. Or, Ortiz could have held the gun in both hands and easily positioned it on the left side of her face to inflict the wound. Any reasonably competent defense attorney who was paying attention to the trial would have at least cross-examined . . . Beaver on this issue and addressed it in closing argument. This would have shown that there was a reasonable way in which the wound could have been self-inflicted, which should have raised a reasonable doubt that [Sagapolu] shot Ortiz."

"The right to effective assistance extends to closing arguments. . . . Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and clarify the issues for resolution by the trier of fact,' [citation], but which issues to sharpen and how best to clarify them are questions with many reasonable answers. . . . Judicial review of a defense attorney's summation is therefore highly deferential . . . ." (*Yarborough v. Gentry* (2003) 540 U.S. 1, 5-6 (*Yarborough*).)

Sagapolu offers no reason why defense counsel, before the prosecutor even made her closing argument, should have examined Beaver concerning whether it would have been difficult for Ortiz to have shot herself. Beaver offered no opinion on the question during direct examination.

As to countering the prosecutor's argument that it would have been difficult for Ortiz to have shot herself, "[t]he decision of how to argue to the jury after the presentation of evidence is inherently tactical." (*People v. Freeman*, *supra*, 8 Cal.4th at

11

p. 498.) Considering the location of the entry near Ortiz's left jaw, that Ortiz was right-handed, and that the bullet traveled to the right, exiting behind Ortiz's right ear, defense counsel could reasonably conclude that an argument that Ortiz turned her head or held the gun in both hands would be unconvincing, particularly if he needed to include a demonstration with his hands (as it seems the prosecutor did), and serve only to draw attention to that part of the prosecutor's argument. " 'A decision not to address an issue, an opponent's theory, or a particular fact should be based on . . . the ability of the advocate . . . to explain persuasively the position to the fact finder.' " (*Yarborough*, *supra*, 540 U.S. at p. 8.) We have no reason to conclude that failure to attempt to counter the prosecutor's argument was outside the permissible range of competent representation. We also have no reason to believe that Sagapolu was prejudiced because Beaver's testimony was *evidence* that the location of Ortiz's wound was quite unusual for a self-inflicted gunshot wound that was far more damaging to Sagapolu than the prosecutor's *argument*.

**IV.** *Defense Counsel's Failure to Discuss Reasonable Doubt*

Sagapolu maintains that "defense counsel did not mention the reasonable doubt standard even once in his closing argument. The closest defense counsel came to arguing reasonable doubt was in the concluding portion of his argument, when he said he wanted 'to talk about the burden of proof.' Defense counsel then argued that it was not the burden of the defense to show that Ortiz shot herself, but the prosecution's burden to show that [Sagapolu] committed a crime. Defense counsel then concluded: 'I don't think that the evidence is there. I think the evidence runs the other way.' Defense counsel's argument did not even suggest that the prosecution had the burden of proving [Sagapolu's] guilt beyond a reasonable doubt. If anything, this argument suggested that the prosecution's burden was to prove [Sagapolu's] guilt by a preponderance of the evidence."

Defense counsel began his opening argument by pointing out that there was no direct evidence that Sagapolu fired the gun that killed Ortiz. He argued that DNA evidence did not show that Sagapolu handled the gun and no evidence showed that the

12

gun was his. He argued that Sagapolu's hands tested negative for gunshot residue and he had no opportunity to wash before samples were taken. He argued that there was no evidence that Sagapolu wore the gloves that were in evidence. He noted that Ortiz, unlike Sagapolu, did have gunshot residue on her hands. In summary, defense counsel competently stressed the significant evidence that could raise a doubt in the minds of the jury. Defense counsel did not mention "reasonable doubt," but the court instructed the jury with the standard instruction on reasonable doubt. We find no implication in defense counsel's argument that a preponderance of the evidence standard applies.

Sagapolu relies primarily on *People v. Smith* (2013) 212 Cal.App.4th 1394, in which Smith asserted that he received ineffective assistance because his attorneys failed to demand that his status as a sexually violent predator (SVP) be established pursuant to Welfare and Institutions Code section 6605 (requiring the state to prove SVP status beyond a reasonable doubt) and instead agreed to a hearing pursuant to section 6608 (requiring Smith to negate SVP status by preponderance of evidence). (*Smith* at pp. 1407-1408.) The court concluded that "there can be no satisfactory explanation for agreeing to shift from the state the heavy burden of proving Smith's SVP status beyond a reasonable doubt, to Smith to negate that claim by a preponderance of the evidence." (*Id.* at p. 1408.) *Smith* is inapplicable here, where defense counsel neither shifted the burden nor suggested a standard of proof less than beyond a reasonable doubt.

In *Yarborough*, defense counsel did not argue explicitly that the government had failed to prove guilt beyond a reasonable doubt, but the court did not find ineffective assistance because defense counsel's argument was "the very essence of a reasonable-doubt argument." (*Yarborough*, *supra*, 540 U.S. at p. 10.)

Defense counsel here pointed to the weaknesses in the prosecution's case and referred to the prosecution's burden. As in *Yarborough,* defense counsel's argument was, in essence, a reasonable doubt argument, and we do not find his performance deficient. The jury was properly instructed concerning reasonable doubt, and there is no basis for concluding that the jury did not understand the proper standard or that Sagapolu was prejudiced. The fact that the jury took nearly five days to reach a verdict is a strong

13

indication that it took seriously its duty to evaluate the evidence under the standard by which it had been instructed.

### IV. *Petition for Writ of Habeas Corpus*

In addition to his direct appeal, Sagapolu has also filed a separate petition for writ of habeas corpus, raising no new issues, but requesting an evidentiary hearing. "Where the record does not illuminate the basis for the challenged acts or omissions [of defense counsel], a claim of ineffective assistance is more appropriately made in a petition for habeas corpus. In habeas corpus proceedings, there is an opportunity in an evidentiary hearing to have trial counsel fully describe his or her reasons for acting or failing to act in the manner complained of." (*People v. Pope* (1979) 23 Cal.3d 412, 426, overruled on other grounds in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)

Here, the record does not tell us why defense counsel made the omissions that Sagapolu maintains demonstrate ineffective assistance of counsel. However, even if, contrary to our determinations above, one or more of those omissions did demonstrate deficient performance of defense counsel, Sagapolu has failed to demonstrate that he was prejudiced. We conclude that Sagapolu has not stated a prima facie case for relief in his petition, which we deny in a separate order. (*People v. Duvall* (1995) 9 Cal.4th 464, 475.)

### V. *Stay of the Sentence on Count 2*

The People contend that the trial court erred in staying the sentence on count 2, pursuant to section 654. In his reply brief Sagapolu argued that the People may not raise this issue without filing their own appeal, pursuant to section 1238. At oral argument, the People argued that our consideration of the issue is permitted by section 1252.

Section 1252 provides, in relevant part: "On an appeal by a defendant, the appellate court shall, in addition to the issues raised by the defendant, consider and pass upon all rulings of the trial court adverse to the State which it may be requested to pass upon by the Attorney General."

Although section 1252 is broadly worded, "there is some merit to the contention that section 1252 should be subject to reasonable limitations." (*People v. Mendoza*

14

(2011) 52 Cal.4th 1056, 1076).  The *Mendoza* court applied the rule of *People v. Braeseke* (1979) 25 Cal.3d 691, 701) that " 'the People may, on an appeal by the defendant and pursuant to the provisions of section 1252, obtain review of allegedly erroneous rulings by the trial court *in order to secure an affirmance of the judgment of conviction.*' " (*Mendoza* at pp. 1076-1077.)

The People's allegation of a sentencing error is unrelated to arguments for affirmance or reversal of Sagapolu's conviction.  Accordingly, we do not address the People's assertion of error.

## DISPOSITION

The judgment of the trial court is affirmed.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Richman, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.