Filed 8/18/15  P. v. Wright CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE, | C072781 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F05836) |
| v. | |
| KEITH WRIGHT, | |
| Defendant and Appellant. | |

During a one-month period in the summer of 2011, defendant Keith Wright entered three separate residences in the Natomas area of Sacramento and robbed the residents of their valuables at gunpoint.  He entered all three residences between midnight and 12:30 a.m.  In two of the incidents, he locked the victims in the trunk of their car before he made his escape.  In the last incident, the resident was a woman living alone, and he forced her to orally copulate him before stealing her money and valuables.

1

Much of the property stolen in the home robberies was later recovered at defendant's home. In one of the robberies, defendant took some rare foreign currency, which he later exchanged at a currency exchange. Security footage showed defendant and his mother exchanging the foreign currency. All but one of the victims identified defendant as their attacker. The other said defendant looked like the attacker, but could not make a positive identification.

The jury convicted defendant on multiple counts of first degree residential burglary, first degree robbery, kidnapping, kidnapping to commit robbery, false imprisonment, and forced oral copulation. The trial court sentenced defendant to an indeterminate term of 114 years to life plus 120 years 8 months.

We disagree with defendant's argument that his conviction must be reversed because of prosecutorial misconduct and instructional error. We also disagree with his argument that there was insufficient evidence to support the asportation element of kidnapping. We disagree with defendant's argument that the forced oral copulation offenses should not be punished with consecutive sentences because they did not involve separate occasions. We disagree with defendant's claim he received ineffective assistance of counsel at sentencing.

We agree with defendant's argument that one of his convictions for kidnapping with the intent to rob Doe must be reversed because the evidence established only a single uninterrupted period of confinement. We also agree that all of his false imprisonment convictions must be reversed because they are necessarily included in the offense of kidnapping. We agree that the trial court should have stayed the burglary sentences pursuant to Penal Code section 654.[1] We do not agree that the kidnapping

---

[1]   Further statutory references to sections of an undesignated code are to the Penal Code.

2

sentences should have been stayed for the kidnappings of Rashid, Uddin, and Doe, but we agree the kidnapping sentence should have been stayed for the kidnapping of Bryant.

Finally, we disagree with defendant's argument that the order requiring him to reimburse the county for his court-appointed attorney fees be stricken because the court made no express finding of unusual circumstances.

We will remand the matter for resentencing, as more fully explained below.

FACTUAL AND PROCEDURAL BACKGROUND

A. Crimes Against Gary Bryant

The first of the home-invasion robberies occurred around 12:25 a.m. on July 21, 2011. The victim was 60-year-old Gary Bryant, who was at his home in south Natomas. Bryant's testimony was hampered somewhat by a stroke he suffered either in January 2011 or January 2012. The stroke affected his ability to describe events and details, but it did not affect his ability to remember important events, and he considered the incident an important event.

Bryant opened his exterior garage door and took out a load of garbage. He returned inside the house to collect more trash, leaving the exterior garage door open and the door from the garage to the house unlocked. As he was in the hallway preparing to take out the second load of garbage, he saw a man in the hallway pointing a gun at him. The man was Black, approximately six feet one inch tall, muscular, and in his mid-twenties to early thirties. Bryant identified defendant as the person he saw, both at the preliminary hearing and at trial. Defendant was wearing a long-sleeve, hooded sweatshirt with the hood up, dark pants, and two-tone tennis shoes.

Defendant pointed the gun at Bryant and demanded "[w]here is the fucking guns and where is the money[?]" Defendant ordered Bryant to get on his knees and crawl from room to room. Defendant made Bryant crawl to five different rooms, with a gun to Bryant's neck, repeatedly demanding money and guns. Defendant repeatedly told Bryant

3

not to look at him. Defendant rummaged through everything in the house. Bryant estimated defendant was inside the house for about two hours.

Defendant finally made Bryant crawl to the garage and lie down. He lay or knelt there for about a half-hour while defendant went through Bryant's car. Bryant waited another half-hour, and not hearing anything, went back into the house. Bryant's phone was disconnected, so he went next door to call 911. Bryant later found his cell phone with the battery removed in the toilet.

Defendant took three guns from Bryant: a semiautomatic, a revolver, and a shotgun. He also took a Garmin global positioning satellite (GPS) unit, a radar detector, and a handheld safe and its contents and keys. Inside the safe was $4,000 in cash, and collector coins, including Susan B. Anthony dollars.

B. Crimes Against Rashid and Uddin

The second incident occurred around 12:30 a.m. on August 8, 2011. Babar Rashid and Arbab Uddin lived in a house in south Natomas. Uddin was in the garage smoking a cigarette and lying on a couch with the garage door open, when a man came up behind him with a gun. The man was African-American, approximately six feet one inch to six feet three inches tall, about 230 to 250 pounds, and in his early to mid-thirties. Uddin identified defendant at trial as the intruder. The man grabbed Uddin by the collar, made him stand up, and walked him to the door into the house while holding a gun to his head. He told Uddin to close the garage door, and asked how many people were inside the house. Uddin told him there was only one other person. They went inside and found Rashid asleep on the couch in the living room.

Rashid woke up and saw Uddin with a man holding a gun to his head. Rashid described the gunman at trial as African-American, six feet one inch to six feet two inches tall, at least 220 to 230 pounds, and between 30 and 40 years old. He was wearing a hooded sweatshirt and his face was covered with a bandana. Rashid was not able to

4

definitively identify defendant at trial, but stated that defendant was the same height and build, same race and skin tone as the intruder.

The gunman kept asking "[w]here the fuck is the gun." He also asked if they had marijuana. He made the two go upstairs to Rashid's bedroom and get down on the floor. When he demanded money, Rashid told him there was money in his closet. Rashid had about $500 in United States currency, and between 7,500 to 9,000 Qatari Riyals. Defendant proceeded to take things out of Rashid's closet and put them in a pillowcase he took off of one of the pillows. He then made the two go to Uddin's bedroom. He told them not to look at his face. He took around $100 cash, including Pakistani money. He then took them back downstairs, where he took a Play Station 3. He took the pair into the garage and asked for the car key. He opened the trunk and made them get in.

While they were in the trunk, they could hear the gunman upstairs in the two bedrooms directly above the garage. He was upstairs approximately 15 minutes before coming back to the garage to ask Rashid and Uddin where to find the "weed" and the gun. They told him they did not have any. A few minutes later they heard the front door close and heard the man running outside. They eventually exited the trunk by using the release button. They went to a neighbor's house to call the police.

Defendant took Uddin's and Rashid's cell phones and the cash, the Play Station 3, and several games for the Play Station 3, including Call of Duty: World at War, Call of Duty Four: Modern Warfare, Call of Duty: Modern Warfare Two, Grand Theft Auto Four, and Madden Ten.

At trial Uddin identified the jeans worn by the intruder by the color, style, and cuts and hole in one leg. The jeans were found in defendant's residence.

A forensic examination of a laptop recovered from defendant's residence revealed that shortly after the incident at Uddin and Rashid's home, at 2:24 a.m., an internet search was conducted for "Qatar Central Bank, 500 riyals in USA currency . . . ." Two more searches were done from the computer comparing Qatar and United States currency at

5

2:28 a.m. and again at 2:36 a.m. The next day, August 9, 2011, around 11:00 a.m., defendant and his mother, Elizabeth Stewart, went to the Travelex office on Capitol Mall in Sacramento. They exchanged 7,500 Qatari Riyal, all in 500 Riyal bills, which amounted to $1,807.31. The consultant who exchanged the money for defendant and his mother testified that Qatari Riyals are very rarely exchanged in Sacramento, and that this was only the first or second time she had seen the currency in the 14 years she had worked at Travelex.

C. Crimes Against Jane Doe

On August 21, 2011, Jane Doe lived in an apartment in the Natomas area of Sacramento. Around midnight she was using her computer and had her headphones on. She had the sliding door to the enclosed patio unlocked and open to save energy. She heard a noise, looked around, and saw a man inside her apartment, pointing a gun at her. The man was African-American, at least 200 pounds, a little over six feet tall, and Doe guessed his age was mid-twenties by the clothing he wore. He was wearing a white, long-sleeve, hooded shirt. He wore the hood up and wore a bandana covering his face. The bandana covered everything but his eyes. In court, Doe identified the defendant as her attacker.

Defendant told her to get down on the ground and not to look at him. After about two minutes, he told her to go into her bedroom. Defendant found two cell phones near her bed, which she told him were not activated. He took the batteries out of the phones and tossed them into the toilet. He told her to take off her clothes. Defendant ordered her into the bathroom and told her to lie face down. He looked through her closet, and asked her if she had anything valuable or any jewelry. He asked her where she put the money. When Doe told him she had no cash or valuables, he called her a liar.

Defendant told her to sit back on the bed, and allowed her to put her underwear back on because she was on her menstrual cycle. He threatened her and told her he would not do anything to her if she gave him something. He asked her if she knew who

6

sent him there to kill her. Then, as he pointed his gun at her, he told her to unzip his pants and pull out his penis and suck on it.

She was crying and gagging, but he forced her. Doe estimated she performed oral sex on defendant for a total of 15 to 20 minutes. During that time she stopped, took his penis out of her mouth, then started again five to ten times. He ejaculated all over her chest and in her mouth. Some of it got on her thighs as well. He told her to go to the bathroom and wash off and brush her teeth.

Defendant told Doe to get dressed, then told her to get her wallet. He told her to open it and take out any cash, but she only had a dollar. He then asked her how much she had in the bank and where she banked. She told him she had money in the bank at Wells Fargo. He asked what her daily limit was, and she told him it was $300.

She drove her car with defendant in the passenger seat to the nearest Wells Fargo. He told her where to park and which automated teller machine (ATM) to use. She withdrew $300. He told her to try again, so she tried again twice, but was not able to get any more money. They went back to the car and he told her to drive to the Bank of America. She tried three times at the Bank of America, but was unable to withdraw any money. She drove back to her apartment.

When they went back inside the apartment, he made her look for valuables, and got upset when she did not find any. He threatened to shoot her if she did not find something valuable to give him. She decided to give him her platinum wedding rings so he would leave and not harm her. But after she gave them to him, he kept threatening her.

He told her to go back into the living room, and before he came into the room she hid her cell phone, which was in the back pocket of her shorts between the sofa cushions. He asked her where her cell phone was. She told him he got rid of all her cell phones. He noticed a phone box on her dining table. It was a phone that Doe's sister, Katie, had

7

just purchased for Doe's daughter. Doe had entered her sister Katie's number into the phone. Defendant put the phone in his pocket.

He took her driver's license, saying he needed proof in case she called the cops on him. He also ordered her back into her bedroom, told her to take off her top, told her to smile and act as if she was having the best time of her life, and took a picture with the phone she purchased for her daughter. He then ordered her to go into the garage, and climb into the trunk of her car. He closed her in the trunk. He told her to wait ten minutes before she got out. She waited, then went back in the apartment, got the phone she had hidden, and called her brother. Her brother called 911.

In addition to the $300, defendant took Doe's platinum wedding ring, her external hard drive, her iPod Nano, her driver's license, and the new cell phone her sister bought for her daughter.

Doe's mouth, chest, and thigh were swabbed for secretions. A DNA analysis of the chest and thigh swab were the same as defendant's DNA profile. The DNA profile was estimated to occur approximately 1 in 17 septillion of the African-American population.

Forensic examination of the laptop computer recovered from defendant's residence revealed that between 11:16 p.m. and 11:59 p.m. on the night after the morning Doe was attacked, seven searches were conducted of "Natomas home invasions" and "Natomas home invasions' suspect" and similar searches.

D. Investigation of Defendant

Police focused on defendant after discovering the exchange of Qatari Riyal currency in Stewart's name. They discovered her son, defendant, lived near her in Natomas, and that he fit the physical description of the suspect in the home invasion robberies. They also learned that the cell phone that had been taken from Doe was powered on once for a brief amount of time on August 23, 2011. The phone pinged off of a tower that served the area of defendant's residence.

8

Defendant was taken into custody.  His house was searched.  At his home, police found Rashid's Play Station 3, five games taken from Rashid and Uddin's home, some Pakistani currency, Qatari currency, Uddin's cell phone, Rashid's cell phone, Bryant's hand held safe, Bryant's shotgun, Bryant's Garmin GPS unit and mount, stamped envelopes like the ones Bryant kept coins in and collector coins, including Susan B. Anthony dollars, like those stolen from Bryant, Doe's pink iPod, and Doe's daughter's cell phone.  The key to Bryant's safe was found on defendant's key ring.  Also recovered from defendant's house was a bandana that matched the bandana defendant wore during the Doe assault.

A forensic examination of defendant's cell phone revealed a series of text exchanges with Latoya Richardson, a friend of defendant's.  The exchange began with a 12-digit number (120770302783) Richardson texted to defendant.  Defendant admitted this was an eBay sales number.  Defendant sent a message back saying, "It all wrong, the ring is blurry & there is no certificate posted.  The discription is off, the center dimond is 0.51."  Richardson answered, "Ok i will send the certificate and log on now so u can edit it, i got some more pics on my camera!  Relax it can be fixed."  Approximately five minutes later, Richardson wrote, "U rushing me, dam if u would just trust me and gave me a couple of days it wouldn't be a rushed job!  Either u can let me fix it or u can!"  Defendant replied, "The ring should be in the photo solo, white people do trip on buying a use ring from Black folks . . Lol."  Richardson wrote, "If u want it done right, give me time to do it!  Don't knock me, i was rushed ok!"  Near the end of the conversation, after Richardson complained about being rushed, defendant wrote, "Man its been two days & all u need is two photo & its perfect what u talking about?  Two photos."  Richardson replied, "Owwww!  Yeah true but its not like i don't do shit all day!  An its been 1 day keith.  U gave it 2 me yesterday morning!  Its good tho!"

Documents from eBay indicated that item number 120770302783 was a ladies platinum wedding set. The price was $611 and the sale started August 29, 2011, and ended September 5, 2011. The seller's name was LaToya Richardson.

E. Defense

A defense expert testified regarding the unreliability of eyewitness testimony.

Defendant testified on his own behalf. He testified he was six feet three or four inches tall and weighed 310 pounds. He claimed he had not been at any of the victims' houses on the relevant dates. He said the property found at his house was either purchased by him or given to him by someone who owed him a debt. He claimed one of the persons he purchased the property from was Sony Lee, Jane Doe's brother. Defendant confirmed at trial that Sony's name was spelled and pronounced like the manufacturer of the Sony Play Station. Defendant claimed he received the Qatari Riyals from Sony Lee. Sony asked him to exchange the currency because defendant's wife worked for a bank. On rebuttal, Sonny (not Sony) Lee, Jane Doe's brother, testified he did not know defendant.

Defendant claimed he had dated Jane Doe for about nine months, although he was married. He claimed she gave him the cell phone containing her seminude picture and the iPod nano. He claimed that on August 21, Doe came to Madera, where he was attending a family reunion. They met at a Wal-Mart. She was picking up her children from her ex-husband. He assumed she picked them up in Modesto, which he claimed was half-way between Sacramento and San Jose, where the ex-husband lived. He said she performed oral sex on him while they were in the Wal-Mart parking lot. Afterward, he went back to his family reunion. Later that night he went with two people whose names he could not remember to a strip club in Fresno. He could remember neither the name nor location of the strip club. He never told law enforcement either that he was at a strip club in Fresno the night of Doe's attack, or that he had oral sex with Doe in the Wal-Mart parking lot that day because they never asked.

10

Defendant claimed the text messages with Richardson were about a ring she had and was trying to sell.  He was just helping her out and giving her advice.

F.  Verdict and Sentence

The jury rendered a guilty verdict on all charges as follows:  first degree residential burglary (§ 459) against Doe, Rashid and Uddin, and Bryant (counts one, eleven, & eighteen); first degree robbery (§ 211) against Doe, Rashid, Uddin, and Bryant (counts two, twelve, thirteen, & nineteen); four counts of forcible oral copulation (§ 288a, subd. (c)(2)) against Doe (counts four, five, six, & seven); two counts of kidnapping to commit robbery (§209, subd. (b)(1)) against Doe (counts eight & nine); false imprisonment (§ 236) against Doe, Rashid, and Uddin (counts ten, sixteen, & seventeen); and kidnapping (§ 207, subd. (a)) against Rashid, Uddin, and Bryant (counts fourteen, fifteen, & twenty).  The jury also found true the following enhancements:  that defendant used a firearm pursuant to section 12022.5, subdivision (a)(1) in counts one, ten, eleven, sixteen, seventeen, and eighteen; that defendant personally used a firearm pursuant to section 12022.53, subdivision (b) in counts two through nine, twelve through fifteen, nineteen, and twenty; that defendant used a deadly weapon pursuant to section 12022.3, subdivision (a) in counts four through seven; that defendant committed counts four through seven during the commission of a burglary pursuant to section 667.61, subdivision (e)(2); and that defendant personally used a firearm during the commission of counts four through seven pursuant to section 667.61, subdivision (e)(3).

The People's motion to dismiss count three (assault with intent to commit rape) due to insufficiency of the evidence was granted.  The jury found not true the allegations in counts four through seven that the forcible oral copulation occurred during the commission of a burglary with the intent to commit forcible oral copulation.

The trial court sentenced defendant to an indeterminate term of 114 years to life, plus a determinate term of 120 years 8 months.

11

DISCUSSION

I

Prosecutorial Misconduct

A.  Uncalled Witnesses

The prosecutor argued in closing argument that defendant's testimony was entirely fabricated.  As the prosecutor argued, given the DNA evidence and the discovery of the victims' property at his home, defendant had to come up with something.  Thus, to counter the most damaging evidence, the DNA, defendant claimed he had a consensual sexual relationship with Jane Doe.  To counter the stolen property in his garage, he claimed he purchased it from Doe's brother Sonny, whose name he pronounced incorrectly.

It was in the context of arguing that defendant's testimony was a complete fabrication, that the prosecutor made the following comment:

> "If I wanted to question Mr. Wright on everything that he testified to the other day, we'd still be going.  I'd have called someone from Nike.[2] I'd have called someone from EA Sports.[3]  I would have called a whole bunch more people, but sometimes you just have to know when to say when.  And he had told so many lies at that point it was time to say when. That's it.

---

**2**   A pair of Nike shoes seized from defendant's home appeared similar to the shoes worn by the suspect that were captured in Doe's apartment complex's surveillance photos and the Travelex security camera photos.  Defendant testified he owned an "abundance" of Nike shoes because he was sponsored for five years by Nike when he played in the National Football League (NFL).

**3**   It is unclear what relevance EA Sports has to the issue of defendant's credibility. Defendant's opening brief claims EA Sports manufactured the Madden video game stolen in the Rashid/Uddin robbery and found in defendant's home.  Defendant testified that he got the Madden games free as a royalty for playing in the NFL.  Defendant did not say that EA Sports manufactured the game, and defendant points to no such evidence.

"The defense would just have you believe that all of these victims are liars, all of them.

"As I said in my opening argument, the only person that sat in that stand and had to admit to being a liar because he was forced to was the defendant."

Defendant argues this comment deprived him of his Sixth Amendment right of confrontation because it implied there were additional witnesses with evidence favorable to the prosecution.

1. Issue Forfeited for Failure to Object

Defense counsel did not object to the above statement. A defendant cannot complain on appeal of the prosecutor's misconduct unless there was a timely objection and admonition to the jury to disregard the impropriety. (*People v. Benson* (1990) 52 Cal.3d 754, 794.) There is no forfeiture if an objection would have been futile or if the harm could not have been cured. (*People v. Hill* (1998) 17 Cal.4th 800, 820-821.)

Defendant claims an objection is futile if the court previously overruled an objection "made in a similar vein." He points to an earlier overruled objection to evidence not in the record. (See part I.B., *post*.) Defendant is incorrect. A single, prior similar objection overruled by the trial court is insufficient to demonstrate that an objection would have been futile. As in both of the cases cited by defendant, *People v. Bain* (1971) 5 Cal.3d 839, 848-849, fn. 1, and *People v. Hill, supra*, 17 Cal.4th at pp. 820-821, it must have been the "unusual circumstance[]" (*People v. Hill*, at p. 822) where the prosecutor engaged in "continual misconduct, coupled with the trial court's failure to rein in [the prosecutor's] excesses, [which] create[s] a trial atmosphere so poisonous that [defense counsel is] thrust upon the horns of a dilemma. On the one hand, he could continually object to [the prosecutor's] misconduct and risk repeatedly provoking the trial court's wrath, . . . [or] decline to object, thereby forcing defendant to suffer the prejudice caused by [the prosecutor's] constant misconduct." (*Id.* at p. 821.) No such circumstance existed here.

13

2. Merits

We nevertheless address the merits of the argument because defendant also asserts an ineffective assistance of counsel claim. We conclude the prosecutor's statement did not amount to misconduct.

The prosecutor's argument did not suggest that she was in possession of undisclosed inculpatory evidence that was being withheld from the jury, nor did she attempt to state in her argument what the testimony of any such witness would be. The prosecutor did not claim that she actually had more witnesses she could have called to testify regarding the untruth of defendant's statements, only that his testimony was so full of untruths that bringing in all the witnesses to give such testimony would have been infeasible because of the undue consumption of time. No reasonable juror would have construed the prosecutor's statements as implying that she was asking the jury to take her word that there were witnesses ready to impeach defendant's testimony if called. That was not the point of her comments, only that defendant's lies were so abundant, it would be impractical to bring in testimony to refute them all.

B. Arguing Facts Not in Evidence

Defendant correctly argues that the prosecutor argued facts not in evidence when she stated that eBay photographs were available only 90 days. However, the error was harmless.

During her initial closing argument, the prosecutor argued that the text messages between defendant and Richardson regarding the eBay transaction were evidence they were selling the platinum wedding ring set defendant stole from Doe on eBay. Defense counsel's argument cast doubt on the prosecutor's theory by pointing out that there were no pictures of the eBay transaction to confirm they were the rings stolen from Doe. In rebuttal, the prosecutor stated, "EBay, [defense counsel] said, you know, there's no evidence of that. There's no photos shown. Well, there are no photos. They are only kept for 90 days. You can't get them after 90 days."

14

Defense counsel objected that those facts were not in evidence, but the trial court overruled the objection. The prosecutor continued, "That's why I showed you those text messages. That is the evidence. That and those documents from eBay."

It was error for the prosecutor to refer to the fact that eBay photographs are deleted after 90 days when that fact was not in evidence. However, the error was not a violation of the federal Constitution, and was harmless under California law.

" 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " (*People v. Espinoza, supra,* 3 Cal.4th at p. 820.)' " (*People v. Hill*, *supra*, 17 Cal.4th at p. 819.)

The prosecutor's argument did not violate the federal Constitution because the one incident of arguing facts not in evidence did not constitute a "pattern of conduct" that infected the trial with unfairness.

The prosecutor's statement referring to facts not in evidence was misconduct under California law. (*People v. Hill, supra*, 17 Cal.4th at p. 828.) Despite the misconduct, the error is not sufficient to merit reversal of defendant's conviction. Prosecutor misconduct does not require reversal in the absence of prejudice. (*People v. Bolton* (1979) 23 Cal.3d 208, 214.) Where, as here, there is no federal constitutional violation as a result of the prosecutor's misconduct, the test of prejudice is "whether it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. [Citations.]' [Citation.]" (*Id*. at p. 214.) Our conclusion is the same under the harmless

15

beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].

The evidence against defendant was overwhelming. All four victims either identified defendant as the perpetrator or indicated he generally matched the perpetrator's height, weight, race, and age. One of the victims identified a piece of clothing at defendant's residence as that worn by the perpetrator. The evidence was overwhelming that all the crimes were committed by the same person because: (1) all the victims and the defendant lived in the same geographic area; (2) all the crimes took place after midnight; (3) in all instances the perpetrator entered through an open door; (4) in all the crimes the suspect was armed with a handgun; (5) the suspect told all victims not to look at him; (6) the suspect asked three of the victims where the "fucking" guns and money were; (7) the suspect made three of the victims lie on the floor; (8) in two of the incidents defendant forced the victims in the trunks of their cars; and (9) in two of the incidents he disassembled the victims' cell phones and threw them in the toilet. A bandana identical to the one worn in the Doe assault was identical to that found in defendant's garage and stolen property from all three robberies was found at defendant's home. Within hours of Rashid's Qatari Riyals being stolen, a search for the value of Qatari Riyals was performed on defendant's computer. The next day, defendant went with his mother to exchange for dollars the quantity of Qatari Riyals stolen, an exceedingly rare transaction in Sacramento. On the day Doe was assaulted, defendant conducted multiple internet searches regarding Natomas home invasions. Defendant's DNA was found on Doe.

A half-carat platinum wedding ring was stolen from Doe, and a week later defendant texted a friend regarding her efforts to sell on his behalf a half-carat platinum wedding ring. In light of the overwhelming evidence against defendant, and numerous fabrications in his testimony, the jury would have concluded defendant was guilty of all charges even if the prosecutor had not told the jury there were no pictures of the ring sold on eBay because the records were destroyed after 90 days.

16

## II
## Instructions

### A.  CALCRIM No. 222

In the oral instructions to the jury, the trial court gave the standard CALCRIM No. 222 instruction as follows:  "Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. [¶]  Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence.  Their questions are not evidence.  Only the witnesses' answers are evidence.  The attorneys' questions are significant only if they help you understand the witnesses' answers.  Do not assume that something is true just because one of the attorneys asked a question that suggested it was true. . . ."

However, in the written instructions given to the jury, the word "attorneys" was replaced with the word "parties" as follows:  "Nothing that the *parties* say is evidence.  In their opening statements and closing arguments, the *parties* discuss the case, but their remarks are not evidence.  Their questions are not evidence.  Only the witnesses' answers are evidence.  The *parties'* questions are significant only if they helped you to understand the witnesses' answers.  Do not assume that something is true just because one of the *parties* asked a question that suggested it was true. . . ."  (Italics added.)

Noting that where there is a discrepancy between the written and oral instruction, the written instructions control, defendant argues that because he was a party to this action and his attorney was not, the written instruction prohibited the jury from considering his trial testimony as evidence.  This, he claims, denied his constitutional right to testify on his own behalf.  We conclude any error was harmless.

We review the merits of the claimed instructional error even though there was no objection below because defendant claims the instruction affected a substantial right, i.e.,

17

the right to testify on his own behalf. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

"When an appellate court addresses a claim of jury misinstruction, it must assess the instructions as a whole, viewing the challenged instruction in context with other instructions, in order to determine if there was a reasonable likelihood the jury applied the challenged instruction in an impermissible manner. [Citations.]" (*People v. Wilson* (2008) 44 Cal.4th 758, 803-804.) We also consider the arguments made by counsel "in assessing the probable impact of the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

Although the substitution of "parties" for "attorneys" in the instruction may have constituted a technical error, the error was harmless beyond a reasonable doubt. (*Chapman v. California, supra*, 386 U.S. 18, 24 [17 L.Ed.2d 705].) Before the jury heard any testimony, the trial court gave CALCRIM No. 104 as follows: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence. . . ." The court gave this instruction again at the close of evidence. Also, as stated, the oral instruction referred to the attorneys rather than the parties. Thus, when the trial court gave essentially the identical instruction, but substituted the word "parties" for "attorneys" the jury must have understood that the distinction being made was between the statements of the witnesses-- which was evidence--and the statements of the attorneys representing the parties--which was not evidence.

Furthermore, the jury understood that the defendant, as a party, did not give an opening statement or closing argument, nor did he ask questions. Therefore, the jury would have understood that the trial court was referring to defendant's attorney and the prosecutor when it gave the instruction. Finally, both the prosecutor and defense counsel reviewed defendant's testimony during closing argument. The jury would not have

18

understood that it could disregard defendant's testimony, when the attorneys gave that testimony so much attention.

Considering all the above, there is no reasonable likelihood the jury understood the instruction to mean it could disregard defendant's testimony.

B. CALCRIM No. 302

The trial court gave the following standard instruction regarding conflicting evidence: "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe. Do not simply count the number of witnesses who agree or disagree on a point and accept the testimony of the greater number of witnesses. On the other hand, do not disregard the testimony of any witness without a reason or because of prejudice or a desire to favor one side or the other. What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point."

Defendant argues that while the instruction is correct with respect to inculpatory evidence, it is erroneous when applied to exculpatory evidence. He argues that inculpatory evidence must be found convincing beyond a reasonable doubt, but exculpatory evidence need not be found convincing or believable. It need only raise a reasonable doubt as to guilt. He argues it was error to instruct the jury to evaluate exculpatory and inculpatory evidence according to the same standard. He claims the instruction diluted the People's burden of proof by suggesting that the jury may believe defendant's witnesses only if it finds that their testimony is believable and convincing, rather than capable of raising a reasonable doubt.

Defendant forfeited the argument by failing to object or request a modification below. A defendant who believes an instruction is incomplete or needs clarification is obligated to request an additional or clarifying instruction. (*People v. Maury* (2003) 30 Cal.4th 342, 426.) Failure to request such clarification forfeits the claim on appeal.

19

(*People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn 22.)

In any event there is no merit to the argument. The instruction CALCRIM No. 302 says nothing at all about reasonable doubt, and several other instructions were given that reiterated the prosecution's burden of proving guilt beyond a reasonable doubt, i.e., CALCRIM Nos. 103 and 220 ("A defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt.") and CALCRIM No. 315 ("The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."). CALCRIM No. 302 "does *not* tell the jury to disregard the prosecution's burden of proof or to decide the case on the basis of disbelief of defense witnesses or presentation of more compelling evidence by the prosecution than by the defense." (*People v. Ibarra* (2007) 156 Cal.App.4th 1174, 1191)

Furthermore, the instruction leaves it to the jury to "decide what evidence, if any , to believe." (CALCRIM No. 302.) Logically, this means the jury may conclude there is a reasonable doubt as to guilt even if it does not believe defendant's exculpatory evidence. The instruction does not say that the jury must believe defendant's exculpatory evidence before it may conclude there is a reasonable doubt as to his guilt. The jury was correctly instructed.

C. CALCRIM No. 376

Without objection from defendant, the trial court instructed the jury with CALCRIM No. 376 as follows: "If you conclude that the defendant knew he possessed property and you conclude that the property had in fact been recently stolen, you may not convict the defendant of robbery and/or burglary based on those facts alone. However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed robbery and/or burglary. [¶] The

20

supporting evidence need only be slight and need not be enough by itself to prove guilt. You may consider how, where, and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt of robbery and/or burglary. [¶] Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

Thus, the instruction allowed the jury to infer defendant was guilty of burglary and robbery from the fact that he knowingly possessed property that had been recently stolen, only if there was at least slight supporting evidence tending to prove guilt. Such an instruction contains a permissive inference.

Defendant argues this instruction violated the test set forth in *Ulster County Court v. Allen* (1979) 442 U.S. 140 [60 L.Ed.2d 777] (*Ulster County*) because it reduced the People's burden of proof by its reference to "slight" supporting evidence, and smothered the presumption of innocence. We review the merits of defendant's argument even though he made no objection at trial because he asserts a violation of substantial constitutional rights. (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574.) We nevertheless find no merit to his arguments.

Defendant argues the instruction violated due process because it did not comport with *Ulster County, supra*, 442 U.S. 140. *Ulster County* held that a permissive presumption that "leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof . . . affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." (*Id*. at p. 157.) "A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*Francis v. Franklin*, (1985) 471 U.S. 307, 314-315 [85 L. Ed. 2d 344].)

21

Defendant argues an inference that he was guilty of the crimes of robbery and burglary from the fact that he was in possession of the stolen property was not a rational inference. He recognizes that the Supreme Court has "repeatedly upheld the giving of the instruction . . . ." (*People v. Gamache* (2010) 48 Cal.4th 347, 375.) But, he argues, the instruction did not pass muster under the facts of this case. He claims the inference of guilt that arose in this case from his possession of the stolen property was "much weaker" because he offered an innocent explanation for his possession of the property.

Defendant's explanation for possession of the property was inherently unbelievable. He claimed to have acquired the stolen property from "Sony" Lee, Jane Doe's brother, a 39-year-old network engineer whose name defendant did not know how to pronounce. Sonny Lee testified he did not know defendant and had never met him. The intruder every victim described was someone who looked like defendant, not someone who looked like Sonny Lee, who testified at trial. This, coupled with the victims' identification of defendant as their intruder, made the inference of guilt " ' "one that reason and common sense justify in light of the proven facts before the jury." ' " (*People v. Gamache, supra*, 48 Cal.4th 347, 375.)

Defendant also argues CALCRIM No. 376 undermines the presumption of innocence and the standard of proof beyond a reasonable doubt. The California Supreme Court has rejected the contention that the instruction lowers the People's burden of proving guilt beyond a reasonable doubt. "CALJIC No. 2.15 [(CALCRIM No. 376's predecessor)] did not directly or indirectly address the burden of proof, and nothing in the instruction absolved the prosecution of its burden of establishing guilt beyond a reasonable doubt."[4] (*People v. Prieto* (2003) 30 Cal.4th 226, 248.) Additionally,

---

[4]  CALJIC No. 2.15 read:

"If you find that a defendant was in [conscious] possession of recently [stolen] [extorted] property, the fact of that possession is not by itself sufficient to permit an

22

CALCRIM No. 376, unlike its predecessor contains the added instruction: "Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."

Defendant claims the jury instruction "derives historically from a substantial evidence test used by reviewing courts to test the sufficiency of the evidence on appeal." He then cites a number of federal Fifth Circuit cases concerning an instruction permitting the jury to link a defendant to a proven criminal conspiracy with only slight evidence. (*United States v. Partin* (5th Cir. 1977) 552 F.2d 621, 628; *United States v. Hall* (5th Cir. 1976) 525 F.2d 1254; *United States v. Gray* (5th Cir. 1980) 626 F. 2d 494, 500.) That instruction read, " 'when a conspiracy has been established by competent proof, only slight evidence is necessary to connect a person with the conspiracy.' " (*United States v. Hall*, at p. 1255.) He quotes *United States v. Hall* which held, "this instruction correctly describes the standard a court should use to determine whether the evidence against a particular defendant supports submission of the case to the jury, but the language should not be used in the charge to a jury." (*Id*. at pp. 1255-1256, fn. omitted.)

The Fifth Circuit cases did not involve a permissive inference at all, rather the offending instruction allowed the jury to connect a person to the commission of a crime on only slight evidence. The instruction here, by contrast, "is a permissive, cautionary

---

inference that the defendant is guilty of the crime of ___. Before guilt may be inferred, there must be corroborating evidence tending to prove defendant's guilt. However, this corroborating evidence need only be slight, and need not by itself be sufficient to warrant an inference of guilt.

"As corroboration, you may consider [the attributes of possession—time, place and manner,] [that the defendant had an opportunity to commit the crime charged,] [the defendant's conduct,] [[his] [her] false or contradictory statements, if any,] [and] [or] [other statements [he] [she] may have made with reference to the property] [a false account of how [he] [she] acquired possession of the stolen property] [any other evidence which tends to connect the defendant with the crime charged]."

23

instruction which inures to a criminal defendant's benefit by warning the jury not to infer guilt merely from a defendant's conscious possession of recently stolen goods, without at least some corroborating evidence tending to show the defendant's guilt." (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1174.) Otherwise, the jury's natural inclination might be to convict a defendant solely on the highly incriminating fact that he is in possession of the stolen goods.

Finally, "CALCRIM No. 376 makes it quite apparent that the 'slight' supporting evidence is not to be considered in isolation, but together with all of the other evidence for purposes of determining whether there is proof beyond a reasonable doubt that the defendant committed robbery. [Citation.] The instruction expressly requires the jury to be 'convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt.' (CALCRIM No. 376.) Thus, CALCRIM No. 376 does nothing to diminish the prosecution's burden of proof." (*People v. Lopez* (2011) 198 Cal.App.4th 698, 711.)

### III
### Doe Kidnapping Convictions

Defendant was convicted in counts eight and nine of two counts of kidnapping with intent to rob Jane Doe, for which he received consecutive seven-year-to-life sentences. Defendant argues one of the kidnapping convictions must be reversed, because "the evidence established a single, uninterrupted period of confinement, with no interval in which the victim regained her freedom . . . ." The People agree, and we accept the concession.

Defendant also argues the abstract of judgment should be corrected to reflect that the sentence for kidnapping with intent to rob is life with the possibility of parole, rather than seven years to life. The People also concede this issue, and we will order the abstract corrected.

24

A. Single Kidnapping

In closing argument, after listing the elements of the offense of kidnapping for robbery, the prosecutor argued: "And what this goes to is the two instances at the bank, all right? What does the defendant say before they even go out to the garage? Get your debit card, we are going to the bank. That shows his intent right there. I'm intending to commit a robbery before we even get in the car. He intended to commit a robbery when he ordered her into the car and made her drive to the Wells Fargo. [¶] The same thing when she gets back in the car, gives him the $300, he tells her to drive to the Bank of America and does the same thing again. Doesn't matter whether or not he actually committed a robbery. For instance, at the Bank of America, she couldn't withdraw any more money."

"[T]he crime of kidnapping continues until such time as the kidnapper releases or otherwise disposes of the victim and has reached a place of temporary safety . . . ." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1159.) Thus, a single abduction followed by a continuous period of detention results in only one kidnapping offense. (*People v. Thomas* (1994) 26 Cal.App.4th 1328.)

Here, even though defendant took Doe to two different banks, she remained forcibly detained the entire time. Defendant threatened her with his gun before she exited the car at each bank, and Doe was too afraid to try to escape while she was at the ATM. The kidnapping continued until Doe was freed. (*People v. Platz* (2006) 136 Cal.App.4th 1091, 1107.) Therefore, there can be only one kidnapping offense against Doe.[5]

---

[5] Because we determine that one of the kidnapping convictions must be reversed, we need not address defendant's argument that the trial court had a sua sponte duty to instruct the jury on how to determine when one kidnapping ends and another begins.

25

B. Sentence for Kidnapping for Robbery is Life with Possibility of Parole

The trial court sentenced defendant to an "indeterminate term of life with minimum eligible parole dates on those crimes [(the two kidnappings for the purpose of robbing Doe)] of seven years." However, the abstract of judgment listed the punishment for those crimes as seven years to life. Defendant notes that the punishment for a violation of section 209, subdivision (b) is life with the possibility of parole. A different statute, section 3046, subdivision (a)(1), provides that no prisoner imprisoned under a life sentence may be paroled before serving at least seven years.

Defendant argues the sentence recorded in the abstract of judgment is potentially prejudicial if section 3046 is ever amended or repealed, because he could not benefit from a change in the law if the seven-year term is incorporated into his sentence as a mandatory minimum.

The People agree that the minimum parole date is not a part of the sentence, and that abstract should be amended. We shall order it.

IV
False Imprisonment Convictions

Defendant was convicted in counts eight, nine, fourteen, and fifteen of kidnapping Rashid, Uddin, and Doe. He was also convicted in counts ten, sixteen, and seventeen of false imprisonment for the same victims, and sentenced to consecutive terms of eight years for each count. The false imprisonment convictions were based on defendant's actions in locking the victims in the trunks of their cars.

Defendant argues he may not be convicted of both kidnapping and false imprisonment because false imprisonment is a necessarily included offense of kidnapping. The People concede the issue, and we agree.

"The law prohibits simultaneous convictions for both a greater offense and a lesser offense necessarily included within it, when based on the same conduct." (*People v. Milward* (2011) 52 Cal.4th 580, 589.) An offense is a necessarily included in a greater

26

offense "if the greater crime ' "cannot be committed without also necessarily committing" ' the lesser offense." (*Id.* at p. 588.) False imprisonment is a necessarily included offense of kidnapping. (*People v. Magana* (1991) 230 Cal.App.3d 1117, 1120-1121.)

As indicated previously, Doe's kidnapping did not end until she was freed, thus her time locked in her trunk was part of her kidnapping. As to Rashid and Uddin, the prosecutor argued the jury could find defendant guilty of kidnapping based on his forcing the victims into the trunk of the car. The false imprisonment convictions must be reversed because they were based on the same conduct as the kidnapping convictions.

V

Sufficient Evidence of Asportation

Defendant was convicted of kidnapping Rashid, Uddin, and Bryant. The trial court gave the following instruction on the elements of kidnapping: "One, the defendant took, held, or detained another person by using force or by instilling reasonable fear; [¶] [t]wo, using that force or fear, the defendant moved the other person or made the other person move a substantial distance; [¶] [t]hree, the other person did not consent to the movement; and [¶] [f]our, the defendant did not actually and reasonably believe that the other person consented to the movement. [¶] . . . [¶] Substantial distance means more than a slight or trivial distance. In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement. Thus, in addition to considering the actual distance moved, you may also consider other factors such as whether the distance the other person was moved was beyond that merely incidental to the commission of the robbery, whether the movement increased the risk of physical or psychological harm, increased the danger of a foreseeable escape attempt, gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection."

27

Defendant argues the evidence showed no more than room-to-room movement within the victims' houses, and that such movement is insufficient to support a conviction for kidnapping. We disagree that just because the movement was solely within the victims' homes and attached garages, the movement was necessarily insubstantial. Defendant cites two cases for this proposition, *People v. Sheldon* (1989) 48 Cal.3d 935 and *People v. Brown* (1974) 11 Cal.3d 784. However, both were decided before *People v. Martinez* (1999) 20 Cal.4th 225 (*Martinez*), the Supreme Court decision that changed the test for determining a "substantial distance" in simple kidnapping from a determination based solely on the actual distance moved to a consideration of the " 'scope and nature' " of the movement. (*Id*. at pp. 235-236.)

The test set forth in *Martinez* directs a consideration of the "totality of the circumstances," which includes: (1) the actual distance moved, (2) whether the movement increased the risk of harm above that which existed prior to the movement, (3) whether the movement decreased the likelihood of detection, and (4) whether the movement increased the danger inherent in the victim's foreseeable attempts to escape and the defendant's enhanced opportunity to commit additional crimes. (*Martinez, supra*, 20 Cal.4th at p. 237.) Where, as here, the case involves an associated crime, the jury must also consider whether the "distance a victim was moved was incidental to the commission of that crime in determining the movement's substantiality." (*Id.* at p. 237.)

The jury was correctly instructed in the factors it should consider in determining whether the movement was substantial, and we conclude there was sufficient evidence to support the jury's determination in each case.

Rashid and Uddin were both locked in the trunk of a car after being taken from room to room inside the house and out into the garage. This movement decreased the likelihood of detection and enhanced defendant's opportunity to go through the house looking for more things to steal. Closing the two victims up in the trunk of the car was not merely incidental to the robbery, as the robbery could have been committed without

28

putting the victims in the trunk. Arguably, the movement also increased the risk of harm to the victims. Had there not been a safety release in the trunk, the victims would not have been able to escape until someone discovered them, if anyone discovered them.

Bryant, who was 60 years old, was made to crawl on his hands and knees from room to room in his house while defendant held a gun to his neck. There was sufficient evidence in the record from which the jury could have concluded Bryant had suffered a stroke a few months before the incident.[6][7] The jury could have concluded that forcing Bryant to crawl from room to room was movement that increased the risk of physical harm to Bryant, who was older and had recently suffered a stroke. This was sufficient for the jury to conclude the movement of Bryant was substantial and not trivial or slight.

VI

Firearm Enhancement and Count One Burglary Sentence Must Be Stayed

Defendant was convicted of forcible oral copulation against Doe in counts four through seven. As to those four counts, the complaint alleged that defendant committed them during the commission of a burglary within the meaning of section 667.61, subdivision (e)(2) and personally used a deadly or dangerous weapon within the meaning of section 667.61, subdivision (e)(3). The trial court sentenced defendant to four 25-year-to-life sentences for counts four through seven pursuant to section 667.61, also known as the "One Strike" law.

As is relevant, section 667.61 provides that an indeterminate term of 25 years to life shall be imposed if the defendant has been found guilty of forced oral copulation, and

---

[6]   The stroke affected Bryant's memory. He said on direct that he had the stroke in January 2012. He stated on cross that the stroke occurred in January 2011, six months before the incident.

[7]   At the preliminary hearing Bryant said the stroke was in 2011. He also indicated he had severe neuropathy in his legs. Although this information was not before the jury, the jury would have been able to see Bryant and assess his physical condition.

at least two specified circumstances apply, including: (1) oral copulation during the commission of burglary, and (2) with the personal use of a firearm. Accordingly, defendant received a term of 25 years to life for each of counts four through seven.

Subdivision (f) of section 667.61 "provides that if only the minimum number of qualifying circumstances required for One Strike sentencing treatment have been pled and proved, they must be used as the basis for imposing the One Strike term rather than to impose lesser enhancements or punishment under any other law." (*People v. Mancebo* (2002) 27 Cal.4th 735, 742.) Notwithstanding the provisions of subdivision (f), the trial court imposed a 10-year enhancement on each of counts four through seven pursuant to section 12022.53, subdivision (b), for personal use of a firearm in the commission of a felony, in addition to the 25-year-to-life One Strike sentences. It also imposed a consecutive one-year four-month sentence for the burglary of Doe (count one).

Defendant argues the firearm use enhancements as to counts four through seven must be stricken, and the burglary sentence imposed in count one must be stayed. The People concede, and we agree.

## VII
### Multiple Counts of Forced Oral Copulation

As indicated, defendant was convicted of four counts of forced oral copulation against Doe, for which he received consecutive sentences of 25 years to life for each. The authorization for the consecutive terms was section 667.6, subdivision (d), which provides: "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) [(including forced oral copulation)] if the crimes involve separate victims or involve the same victim on separate occasions. [¶] In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior.

30

Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

Doe estimated she performed oral sex on defendant for 15 to 20 minutes. He asked her twice if she wanted to stop, and the second time she did stop for a moment, they had a brief conversation, then he told her to start again. She estimated that she took defendant's penis out of her mouth, then started again approximately 10 or more times. At one point, defendant asked Doe to use her hands only, then told her to put his penis back in her mouth. There were approximately 10 times that Doe took defendant's penis out of her mouth, and was told to start again.

Defendant argues there was insufficient evidence to support the trial court's determination that the crimes involved separate occasions. Citing *People v. Corona* (1988) 206 Cal.App.3d 13, 17-18 and *People v. Pena* (1992) 7 Cal.App.4th 1294, 1299, he argues Doe's testimony "did not establish any significant interval between sexual acts affording a reasonable opportunity for reflection."

However, *People v. Corona* did not require a significant interval between sexual acts; in fact in *Corona* we concluded there was "no evidence of *any* interval 'between' [the] sex crimes . . . ." (*People v. Corona, supra*, 206 Cal.App.3d at p. 18, italics added.) Likewise, *People v. Pena* did not require a significant interval between sexual acts, and indicated the defendant could not be punished for both rape and oral copulation because he "did not cease his sexually assaultive behavior, and, therefore, could not have resumed sexually assaultive behavior." (*People v. Pena, supra*, 7 Cal.App.4th at p. 1316.)

In reviewing whether there was sufficient evidence to support the trial court's determination that the four incidents of forced oral copulation occurred on separate occasions, this court is " 'not at liberty to overturn the result unless no reasonable trier of fact could decide that there was a reasonable opportunity for reflection.' " (*People v.*

31

*Pena, supra,* 7 Cal.App.4th at pp. 1314-1315, quoting *People v. Corona, supra*, 206 Cal.App.3d at p. 18, fn. 2.)

"Under the broad standard established by Penal Code section 667.6, subdivision (d), the Courts of Appeal have not required a break of any specific duration or any change in physical location." (*People v. Jones* (2001) 25 Cal.4th 98, 104.) "[T]he duration of time between the acts and the retention of the *opportunity to attack* again are not themselves determinative. . . . [W]here . . . the trial court finds the time and the circumstances were sufficient to afford the defendant with the required opportunity to reflect upon his actions and he thereafter resumed his *sexually* abusive conduct, that finding will be upheld unless no reasonable trier of fact could have so concluded." (*People v. Plaza* (1995) 41 Cal.App.4th 377, 385.)

In determining whether the "separate occasions" standard is unconstitutionally vague, this court opined: "It takes no particular depth of reasoning to be able to distinguish between a situation where a perpetrator engages in a continuous course of conduct involving multiple sex offenses with no break in between and one in which the individual offenses are separated by some other activity, either of the defendant or another, that interrupts the assault and affords the perpetrator an opportunity to reflect on what he or she is doing. The activity need not involve any type of movement of the victim and need not be of any particular duration. It may be nothing more than car lights going by that cause the perpetrator to pause and reflect before proceeding, as in *King,* or some activity not amounting to a sex offense, like pausing to listen to the victim's answering machine or punching the wall, as in *Plaza.*" (*People v. Solis* (2012) 206 Cal.App.4th 1210, 1220.)

We conclude that the break which occurred when defendant allowed Doe to stop fellating him and conversed with her briefly was sufficient evidence from which the trial court could conclude the defendant had a reasonable opportunity for reflection. Likewise, when Doe either stopped fellating defendant, or was stimulating his penis with

her hands, only to be told to resume oral sex, the court could conclude defendant had a reasonable opportunity to reflect on his actions, and chose to again force Doe to perform oral sex. The trial court correctly imposed consecutive sentences for each conviction of forced oral copulation.

## VIII
### Trial Court's Reason for Sentence Was Sufficient

In imposing four consecutive 25-year-to-life sentences on the forced oral copulation convictions, the trial court stated: "[California Rules of Court,] Rule 4.426 applies with regard to the sexual assault offenses. These crimes were committed against a single victim but were committed on separate occasions, and therefore I am going to sentence you under subsection 667.6 subdivision (d)." Defendant argues the trial court's statement was insufficient under *People v. Irvin* (1996) 43 Cal.App.4th 1063, 1070-1072.

In *People v. Irvin,* the defendant was convicted of 20 sex crimes and the trial court imposed consecutive sentences on all 20 counts.[8] (*People v. Irvin, supra*, 43 Cal.App.4th at p. 1020) The defendant argued there were only four separate occasions. (*Id.* at p. 1071.) The court of appeal remanded for resentencing because it doubted "any

---

[8]   In sentencing the defendant to consecutive sentences the trial court stated in relevant part: " 'The jury having found that there were separate counts of each particular offense committed, it then is incumbent upon me to determine whether or not the crimes against the victim were committed on separate occasions. I have to consider whether in the commission of any of these offenses the defendant had a reasonable opportunity to reflect upon his actions, upon such reflection, then resume the sexually assaultive behavior that he engaged in. [¶] I am making the determination that . . . there was opportunity for a reflection on behalf of the defendant. This went over a duration of time these various acts were committed, then there was a brief interval. As Miss Frazier indicated, he would stop, have a brief conversation, catch his breath, go back and commit other acts. There was some moving around within the house when these acts were committed. In other words, at one point in time several of the acts were in one room, they went on into another room when the acts continued there. [¶] Accordingly, I find that under those dictates that a consecutive sentence would be in order.' " (*People v. Irvin, supra*, 43 Cal.App.4th 1063, 1069-1070.)

reasonable trier of fact could find that every act or offense was committed on a separate occasion." (*Id.* at p. 1071.) It stated, "if the court decides to resentence defendant under subdivision (d), it must give a factual explanation supporting its finding of 'separate occasions' for each count sentenced under that subdivision. An overall statement of the court's general impression of the evidence is insufficient." (*Id.* at p. 1072.)

Defendant argues the trial court's statement in this case was insufficient, and that the case must be remanded to give the trial court an opportunity to state its rationale as to each offense. We disagree.

The question defendant has presented for us is whether there was sufficient evidence that the sex offenses were committed on separate occasions. We concluded there was sufficient evidence in the record to support the trial court's finding. Here, unlike *Irvin*, the record leaves no room for doubt whether a reasonable trier of fact could find each offense was committed on a separate occasion. Thus, we do not require more specific findings for a meaningful review.

Furthermore, although section 1170, subdivision (c) requires the trial court to "state the reasons for its sentence choice on the record," the trial court has no sentence choice under section 667.6, subdivision (d), if it determines the offenses occurred on separate occasions. If the trial court determines that section 667.6, subdivision (d) applies, consecutive terms are not a choice, but are mandatory. No statement of reasons is required for imposition of a mandatory term. (*People v. Craft* (1986) 41 Cal.3d 554, 559, superseded by statute on another point as stated in *People v. Jones, supra*, 25 Cal.4th 98, 112 ; *People v. Smith* (1984) 155 Cal.App.3d 539, 543.) Nothing in section 667.6, subdivision (d) indicates that the trial court must state reasons to support its finding of "separate occasions." We will not remand for resentencing on this ground.

## IX
## Section 654

Section 654 provides in part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The section applies not only to a single act in the ordinary sense, but to a course of conduct that comprises an indivisible transaction. (*People v. Davis* (1966) 241 Cal.App.2d 51, 55.) Defendant argues several of the sentences the trial court imposed should have been stayed pursuant to section 654.

A. Burglary and Robbery

Defendant was convicted in count eleven of burglary of the Rashid-Uddin residence and in count eighteen of burglary of the Bryant residence. He was also convicted in counts twelve, thirteen, and nineteen of robbing Rashid, Uddin, and Bryant. Neither of the one-year four-month burglary sentences was stayed.

Section 654 precludes punishment for both burglary and robbery where the burglary was incident to the objective of stealing from the victim. (*People v. Green* (1985) 166 Cal.App.3d 514, 518.) The People concede that defendant harbored a single intent and objective of stealing from the victims when he committed the offenses, and that the burglary offenses must be stayed. We accept the concession, and agree with the People that the firearm enhancements imposed as to the burglary counts must also be stayed.

Defendant's additional argument that the burglary sentence must by stayed under section 654 as to the offense against Doe is moot in light of our decision in section VI, *ante*.

B. Robbery and Kidnapping.

As to the robbery and kidnapping counts involving Rashid, Uddin, and Bryant, defendant argues the kidnapping sentences should be stayed because the kidnapping of

those victims was part of a continuous course of conduct motivated by a single intent and objective, which was to commit robbery. The People respond that defendant's intent and objective with respect to Uddin and Rashid was to falsely imprison them in the trunk of the car, and the intent and objective with respect to Bryant was to dominate and control Bryant.

The pertinent question is whether the kidnappings facilitated or were incidental the commission of the robberies. (*People v. Ratcliffe* (1981) 124 Cal.App.3d 808, 818.) Even if the kidnappings were incidental to the commission of the robberies, they may be separately punished if the means employed were so extreme they can no longer be considered merely incidental. (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 191.) Thus, in *People v. Nguyen* the court held the defendant could be separately sentenced for attempted murder and robbery when he and his accomplice entered a market, and the defendant emptied the cash register while his accomplice took the clerk to a back room and shot the clerk in the back. (*Id.* at pp. 185, 191.) The shooting was so extreme and unnecessary it could not be considered merely incidental to the robbery, even though it facilitated the robbery.

1. Bryant

As to Bryant, there is no apparent reason for the kidnapping, which consisted of making Bryant crawl from room to room at gunpoint, other than to facilitate the robbery. The People claim the reason was to dominate and control Bryant, but the domination and control was for the purpose of carrying out the robbery. We also conclude that forcing the victim to crawl from room to room, rather than walk, was not so extreme and unnecessary as to be deserving of separate punishment. We will stay the sentence for the kidnapping of Bryant, as well as the enhancement imposed on the kidnapping conviction.

2. Rashid and Uddin

The Rashid and Uddin robbery is different to the extent the kidnapping consisted of taking the victims to the garage and locking them in the trunk of the car. Three cases

36

are pertinent to our analysis. The first is *People v. Nguyen, supra*, 204 Cal.App.3d at pp. 185, in which the court held that the defendant could be separately punished for robbery and attempted murder, even though the attempted murder was accomplished by defendant's companion while defendant was in the process of robbing the till. In response to the argument that the intent and objective was to allow escape, thus facilitate the commission of the robbery, the court stated: "at some point the means to achieve an objective may become so extreme they can no longer be termed 'incidental' and must be considered to express a different and a more sinister goal than mere successful commission of the original crime. [¶] We should not lose sight of the purpose underlying section 654, which is 'to insure that a defendant's punishment will be commensurate with his culpability.' " (*Id.* at p. 191.)

Also pertinent is *People v. Foster* (1988) 201 Cal.App.3d 20, 27-28 (*Foster*), in which the court held that section 654 did not foreclose a sentence for both false imprisonment and robbery where the defendant locked the victims in the cooler of a mini-mart. The defendant argued the false imprisonment was merely incidental to the robbery, but the court held that since the imprisonment occurred after the robbers had obtained all of the money, the imprisonment was not necessary or incidental to the commission of the robbery. (*Id.* at p. 27.) "Locking the victims in the store cooler was potentially dangerous to their safety and health. It is analogous to a needless or vicious assault committed after a robbery, which has long been held separately punishable and distinguishable from an assault which is merely incidental to robbery." (*Id.* at pp. 27-28.)

Finally, in *People v. Saffle* (1992) 4 Cal.App.4th 434, 437 (*Saffle*), after the defendant had sexually assaulted the victim and while armed with a knife, forbade the victim to answer a knock at the door. The court held that section 654 did not bar separate punishments for false imprisonment and the sex offenses because "once the sexual offenses were completed, Saffle's objective changed. He was no longer interested in

37

fulfilling a sexual objective; he was seeking to prevent [the victim] from reporting the incident." (*Saffle,* at p. 440.)

Thus, gratuitous acts of violence against an unresisting victim, such as locking victims in a cooler (*Foster),* or committing an additional crime to facilitate escape or to discourage the reporting of a crime (*Saffle*), may be grounds for separate punishment. Here, the trial court could have reasonably assumed one reason for putting the victims in the trunk was to prevent them from reporting the crime in a timely fashion and to facilitate escape. Moreover, the act of putting Uddin and Rashid in the trunk of the car was so extreme that it can no longer be considered incidental to the robbery. (*People v. Nguyen, supra*, 204 Cal.App.3d 181, 191.) Uddin testified he pleaded with defendant not to put them in the trunk, and told defendant they could die in the trunk because no one would know they were in the trunk, and no one would be coming to the house. Neither victim knew when they were forced into the trunk that it had a release button. Locking the victims in the trunk is analogous to *Foster*, where the victims were locked in a cooler. (*Foster, supra*, 201 Cal.App.3d 20.) It was potentially dangerous to the victims' safety and health. (*Id*. at p. 27.)

The trial court properly sentenced defendant separately for the kidnapping and robbery of Rashid and Uddin.

C. Robbery and Kidnapping for Robbery of Doe

Defendant argues his sentence for robbing Doe must be stayed in light of his sentences for kidnapping Doe to commit robbery. We disagree.

The facts here are similar to *People v. Porter* (1987) 194 Cal.App.3d 34. There, the defendant and his companion attacked the victim in his car and demanded money. (*Id*. at p. 36.) When the victim had an insufficient amount of cash, the defendant and his companion forced the victim to drive to an ATM, intending to have him withdraw money from his account. (*Id*. at pp. 36-37.) The victim was able to escape. (*Id*. at p. 37.)

The court rejected the defendant's claim that section 654 barred punishment for both kidnapping for the purpose of robbery and robbery. (*People v. Porter, supra*, 194 Cal.App.3d at pp. 37-38) The court stated it was reasonable to infer that the defendant initially planned only to rob the victim, but thereafter came up with the idea to kidnap the victim to his bank to withdraw money. (*Id*. at p. 38.) "In this case the record suggests that appellant was convicted of the robbery of the victim's wallet and of kidnapping for the purpose of a different robbery involving the compelled withdrawal of funds from an automated teller, which was unsuccessful. This is not, therefore, a case of punishing appellant for kidnapping for the purpose of robbery and for committing 'that very robbery.' [Citation.] Nor is this a case of multiple punishment for taking several items during the course of a robbery. [Citation.] What began as an ordinary robbery turned into something new and qualitatively very different. No longer satisfied with simply taking the contents of the victim's wallet, appellant decided to forcibly compel the victim to drive numerous city blocks to a bank where, only with the victim's compelled assistance, could appellant achieve a greater reward. The trial court could reasonably treat this as a new and independent criminal objective, not merely incidental to the original objective and not a continuation of an indivisible course of conduct. In the unusual circumstances of this case, appellant could be punished both for the robbery he committed and the kidnapping for the purpose of a distinctly different type of robbery." (*Id*. at pp 38-39.)

We agree with this reasoning. There is sufficient evidence that defendant committed robbery at Doe's house, then kidnapped her to commit robbery at her bank when she did not have enough of value in her home. The kidnapping for robbery thus was motivated by a new and independent criminal objective that was not merely incidental to the original objective.

39

D. False Imprisonment and Kidnapping, Robbery

Defendant argues the sentences for falsely imprisoning Doe, Rashid, and Uddin in counts ten, sixteen, and seventeen must be stayed in light of the sentences for kidnapping, kidnapping to commit robbery, and robbery. In light of our holding in section IV, *ante*, the argument is moot.

## X
## Double Jeopardy

Defendant argues his federal constitutional guarantee against double jeopardy was violated when he received multiple convictions for kidnapping Doe to commit robbery, received multiple convictions and sentences for three counts of felony false imprisonment, received four firearms use enhancements on three of the oral copulation convictions and one burglary of Doe conviction, and received "several unstayed sentences" in violation of section 654.

Because of our holdings in sections III, IV, VI, and IX A., B.1. and D., *ante*, the argument is moot except for the claim of unstayed sentences for robbery and kidnapping of Rashid, Uddin, and Doe. For the reasons expressed in section IX, *ante*, defendant's constitutional claim with respect to the sentences for robbery and kidnappings of Rashid, Uddin, and Doe is without merit.

## XI
## Assistance of Counsel at Sentencing

Defendant claims his trial counsel provided ineffective assistance at sentencing when he argued that two of the forcible oral copulation offenses were on separate occasions rather than all on one occasion, and when he failed to object after the trial court found he committed the offenses on four separate occasions.

The sentencing memorandum submitted by defense counsel to the court argued: "Testimony at trial established that there was only one significant break during the oral copulation. During this break, defendant asked if Ms. Doe wanted to stop, a brief

40

discussion occurred, and then defendant ordered her to continue orally copulating him. This was clearly a situation where the defendant had a 'reasonable opportunity to reflect' and then 'resumed sexually assaultive behavior.' Thus, there were only two 'separate occasions' of forced oral copulation, not four." The memorandum argued that since there was only one significant break during the conduct, count five should run concurrent to count four, and count seven should run concurrent to count six.

Two days later, the probation report was filed, predictably recommending that the trial court sentence defendant to four separate, consecutive terms of 25 years to life. The trial court agreed, finding all four sexual offenses were committed on separate occasions, and sentencing defendant to four consecutive indeterminate terms.

Defendant argues that when his trial counsel argued he should receive only two consecutive indeterminate terms, counsel was arguing against him, thereby violating his right to effective representation.

"To establish entitlement to relief for ineffective assistance of counsel the burden is on the defendant to show (1) trial counsel failed to act in the manner to be expected of reasonably competent attorneys acting as diligent advocates and (2) it is reasonably probable that a more favorable determination would have resulted in the absence of counsel's failings. [Citations.] '[Where] the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed.' [Citation.] 'In some cases, however, the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one or unless counsel was asked for an explanation and failed to provide one or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal.' [Citation.]" (*People v. Lewis* (1990) 50 Cal.3d 262, 288.)

Additionally, defendant must show prejudice. "[D]efendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 [80 L.Ed.2d 674, 698].)

This case is one in which the record sheds no light on why counsel argued for two consecutive, indeterminate sentences, rather than arguing for only one sentence for all four oral copulation convictions. Since counsel was not asked for an explanation he failed to provide, we must affirm unless there can be no satisfactory explanation for counsel's actions. Even if there can be no satisfactory explanation, we will affirm if there is no prejudice.

Defendant has shown no prejudice in this case. His trial counsel made the argument that there should be only two indeterminate sentences, and still the trial court sentenced defendant to four consecutive indeterminate terms. There is no reasonable probability the result would have been different if defense counsel had argued for only one indeterminate term.

Defendant also argues his counsel rendered ineffective assistance when he failed to object after the court found the four sex offenses were committed on separate occasions. He claims that an objection would have alerted the court to its obligation to make a fact-specific analysis of the evidence to explain its basis for finding that each offense was committed on a separate occasion. Then, he claims, the court would have realized there was an insufficient basis for finding that all four offenses were committed on separate occasions.

As we concluded in part VIII, *ante*, the trial court had no obligation to make a fact-specific analysis of the evidence to explain its basis for finding each offense was committed on a separate occasion. Counsel does not render ineffective assistance by failing to make a nonmeritorious objection. (*People v. Memro* (1995) 11 Cal.4th 786, 874, overruled on another ground in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.)

## XII
## Attorney Fees

The Penal Code authorizes the trial court to order a criminal defendant to pay all or a part of the cost of legal assistance he or she has been provided.  Section 987.8, subdivision (b) provides in pertinent part:  "In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, or upon the withdrawal of the public defender or appointed private counsel, the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof."

Where the probation report recommends the defendant reimburse the county for the cost of trial representation, the matter of attorney fees may be heard at the sentencing hearing.  (*People v. Phillips* (1994) 25 Cal.App.4th 62, 74-75, superseded by statute on another point as stated in *People v. Trujillo* (2015) 60 Cal.4th 860.)  Although section 987.8 does not mandate an express finding of an ability to pay, the statute contains a presumption that those sentenced to prison do not have the ability to pay, thus the court must make an express finding of unusual circumstances before ordering the defendant to reimburse the county for attorney fees.  (*People v. Verduzco* (2012) 210 Cal.App.4th 1406, 1421.)

Defendant argues the order regarding attorney fees must be stricken because the court made no express finding of unusual circumstances.  We disagree both with the conclusion that no express finding was made, and with defendant's proposed remedy. "The preferred solution when a trial court fails to make a necessary finding is to remand the case for a new hearing on the matter."  (*People v. Prescott* (2013) 213 Cal.App.4th 1473, 1476.)  Thus, even if we were to conclude the trial court made no express finding, the remedy would be to remand the case for a new hearing.

43

The probation report recommended defendant be ordered to reimburse the county for the cost of his appointed counsel. At the sentencing hearing, the trial court inquired about information in the probation report indicating defendant received a pension from the NFL in the amount of $580,000 annually. Defense counsel represented that the information was a "misunderstanding" and that defendant was not currently receiving a pension. The prosecutor weighed in that defendant had testified at trial that he "gets a pension from the NFL. He testified to that under oath."[9] The prosecutor indicated she had asked the probation officer whether it was correct that the defendant reported receiving $580,000 per year from his NFL pension, and the probation officer responded yes. The probation officer said she had confronted defendant about it again, and he insisted that he got that amount of money.

At the sentencing hearing, the trial court stated: "I was really interested in that statement by probation about your income, and based on what has been said, I believe it to be true. You are or at least have been and may be currently receiving well over one-half million dollars a year in an NFL pension. Needless to say, I do not see defendants sitting in orange jumpers in front of me facing the type of sentence that you face that receive that type of income, and all[] you had to do for it was walk to your mailbox. That is a stunning fact." Later, the trial court ruled, "[Y]ou shall fully repay the County of Sacramento for the services rendered by the Public Defender's Office."

The trial court's statements were the equivalent of an express finding of unusual circumstances. The trial court noted defendant's large pension, and stated that it was unusual for a defendant to receive a half-million dollars a year in income. It was unnecessary for the court to state that these facts constituted a court finding.

---

[9] In response to questioning from his counsel, defendant testified he was retired from the NFL and that he received a full pension.

## DISPOSITION

The judgment of conviction is reversed as to counts nine (kidnapping with intent to rob Doe), ten (false imprisonment of Doe), sixteen (false imprisonment of Rashid), and seventeen (false imprisonment of Uddin).  The case is remanded with directions to modify the judgment as follows:  (1) The sentences for counts eight and nine (kidnapping for robbery of Doe) are life with the possibility of parole; (2) The sentence and enhancement for count one (burglary of Doe) is stayed; (3) the 10-year firearm use enhancements for counts four, five, six, and seven are stricken; (4) the sentences and section 12022.5, subdivision (a) enhancements for counts eleven and eighteen (burglary of Rashid, Uddin, & Bryant) are stayed; and (5) the sentence and section 12022.5, subdivision (a) enhancement for count twenty (kidnapping Bryant) is stayed.  As so modified, the judgment is affirmed.

The trial court is directed to issue an amended abstract of judgment reflecting these modifications, and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


      BLEASE      , Acting P. J.


We concur:


    NICHOLSON    , J.


    HOCH     , J.